Justice Brown delivered the opinion of the Court.
This case requires us to decide whether short-term vacation rentals violate certain restrictive covenants that limit tracts to residential purposes and single-family residences. The trial court concluded that a homeowner violated the restrictions by operating a business on a residential tract and engaging in multi-family, short-term rentals. The court of appeals affirmed, agreeing with the trial court that the rental agreements contradict the residential-purpose limitation because the renters' stays are merely temporary. We hold that the unambiguous restrictive covenants impose no such limitation and decline to inject restrictions into covenants under the guise of judicial interpretation. Accordingly, summary judgment for the homeowner's association was improper. We reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.
I
In 2012, Kenneth Tarr purchased a single-family home in San Antonio's Timberwood Park subdivision. Two years later, after his employer transferred him to Houston, Tarr began advertising the home for rent on websites such as VRBO (short for Vacation Rentals by Owner). See Santa Monica Beach Prop. Owners Ass'n v. Acord , 219 So.3d 111, 113 n.2 (Fla. Dist. Ct. App. 2017) (describing VRBO as "a website on which owners can advertise their houses and other properties for rent"). He also formed a limited-liability company called "Linda's Hill Country Home LLC" to manage the rental of the home. Between June and October of 2014, Tarr entered into thirty-one short-term rental agreements, ranging from one to seven days each. In the aggregate, the home was rented for 102 days.
Tarr's short-term rental contracts permit various-sized rental parties but limit the guest count to no more than ten people. And the home was indeed leased to parties of all sizes. For example, the home was booked by parties consisting of three adults and three children, four adults and five children, six adults and four children, seven adults and one child, and nine adults and no children. Nearly one quarter of the rentals were to two adults accompanied by as many as six children. The agreement does not mandate that the guests be members of a single family, and the record contains no evidence of the familial relationships of the individuals to whom the home was leased. These rental groups came from towns throughout Texas, as well as other states, such as Washington and Indiana.
The short-term rental agreement that Tarr employed leased the entire home, rather than individual rooms, to these various groups. So unlike what one might expect at a hotel, rental groups were alone in Tarr's house, unaccompanied by employees and without services a hotel stay might provide, such as cooked meals or housekeeping. In addition, no business office, leasing office, signage, or other business *277 activity exists at the home. But Tarr does remit hotel taxes applicable to home rentals of less than thirty days. Specifically, he pays the Texas Hotel Tax, which applies to such rentals statewide, see TEX. TAX CODE ch. 156, and the San Antonio/Bexar County Hotel/Motel Occupancy Tax.
The dispute that led to this case arose late in 2014. As reflected in a plat recorded in the Bexar County plat records in 1979, Timberwood Park Unit III, which includes Tarr's property, is subject to certain "easements, covenants, conditions, and restrictions." In July and September of 2014, the Timberwood Park Owners Association notified Tarr that the rental of his home violated two deed restrictions: (1) the residential-purpose covenant, and (2) the single-family-residence covenant. The residential-purpose covenant provides, in part:
All tracts shall be used solely for residential purposes, except tracts designated ... for business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful by reason of odor, dust, smoke, gas, fumes, noise or vibration ....
No one disputes that Tarr's tract is not designated for business purposes. A separate paragraph sets forth the single-family-residence restriction, which provides:
No building, other than a single family residence containing not less than 1,750 square feet, exclusive of open porches, breezeways, carports and garages, and having not less than 75% of its exterior ground floor walls constructed of masonry, i.e., brick, rock, concrete, or concrete products shall be erected or constructed on any residential tract in Timberwood Park Unit III and no garage may be erected except simultaneously with or subsequent to erection of residence.... All buildings must be completed not later than six (6) months after laying foundations and no structures or house trailers of any kind may be moved on to the property.
Because the leases of Tarr's home were temporary, the association determined short-term rentals did not adhere to the "single family residence" restriction and, instead, rendered the tract "a commercial rental property." So the association sent Tarr a violation notification requesting his compliance. The notification further indicated that the violation would remain in effect until the online advertisements were taken down and the home was no longer used for commercial purposes. Should he not comply within fourteen days, the notification letter warned, the association would assess a fine of $25 per day.
Tarr did not heed the association's warnings. And throughout the dispute, neither the association nor Tarr attempted to amend the deed restrictions to specify a minimum duration for leasing-an option available to both of them under the deed's amendment provisions. Instead, the fines against Tarr mounted steadily.[1] Tarr appealed the imposition of the fines to the association's board. The board heard and denied the appeal in September 2014, stating it would continue imposing the fines so long as the violations persisted. Five days after the board sent a letter denying his appeal, Tarr sued for a declaratory judgment and claimed breach of the restrictive covenants.
Tarr sought a declaration that the deed restrictions do not impose a minimum duration on occupancy or leasing. Nor, Tarr contended, do they permit the association to police home-rental advertisements or impose penalties in the form of fines. The *278 association filed a general denial; both parties sought attorney's fees.
The trial court soon faced competing traditional summary-judgment motions. It granted the association's and denied Tarr's, concluding that Tarr operated a business on his residential lot and engaged in "multi-family," short-term rentals in violation of the unambiguous deed restrictions. In doing so, the trial court noted that it must ascertain the drafters' intent by "balancing the statutory requirement to liberally construe language within restrictive covenants with the common law mandate to strictly construe restrictive clauses in real estate instruments resolving all doubt in favor of the free use of real estate." It reasoned that one's use of a home is not residential unless the occupant is physically present and has an existing intent to physically remain there for a sufficient duration. The trial court also permanently enjoined Tarr from "operating a business on his residential lot" and from engaging in short-term rentals to "multi-family parties." In a separate order, the trial court awarded attorney's fees to the association. Tarr appealed.
The Fourth Court of Appeals affirmed the trial court, holding that the deed restrictions prevented Tarr from leasing the home for short periods of time to individuals who did not possess an intent to remain in the house. 510 S.W.3d 725, 730 (Tex. App.-San Antonio 2016). First, the court noted that the intent underlying the covenant at issue must be afforded a liberal construction as it is unambiguous, and thus the rule disfavoring restrictions on the free use of property did not apply. Id. at 729-30. The court of appeals relied on its opinion in Munson v. Milton , in which it noted that though "residence" welcomes a variety of connotations, the term usually mandates both a "physical presence and an intention to remain." Id. at 730 (quoting Munson v. Milton , 948 S.W.2d 813, 816 (Tex. App.-San Antonio 1997, pet. denied) ). Accordingly, it distinguished between "transient" and "residential" purposes on property subject to such restrictive covenants. Id. at 730-31. And under the facts of this case, especially in light of the short-term rental agreements and Tarr's creation of an LLC to manage the property, as well as his payment of hotel taxes, the court of appeals held the leasing agreements to be in direct contradiction with its residential-purpose test-that the renter intend to remain at the home with a contemporaneous physical presence. Id. Tarr sought our review.
II
A trial court's ruling on a motion for summary judgment is reviewed de novo. Joe v. Two Thirty Nine Joint Venture , 145 S.W.3d 150, 156 (Tex. 2004). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). Here, Tarr and the association filed cross-motions for summary judgment. When competing summary-judgment motions are filed, "each party bears the burden of establishing that it is entitled to judgment as a matter of law." City of Garland v. Dall. Morning News , 22 S.W.3d 351, 356 (Tex. 2000). In that instance, if "the trial court grants one motion and denies the other, the reviewing court should determine all questions presented" and "render the judgment that the trial court should have rendered." Id. ; see also Comm'rs Court of Titus Cty. v. Agan , 940 S.W.2d 77, 81 (Tex. 1997) (requiring appellate courts to "review the summary judgment evidence presented by both sides" when making this inquiry); Guynes v. Galveston Cty. , 861 S.W.2d 861, 862 (Tex. 1993) (reviewing cross-motions for summary judgment *279 where the facts were undisputed by "determining all legal questions presented").
III
The parties do not dispute that the deed provisions at issue contain restrictive covenants. Like a trial court's summary-judgment ruling, courts review "a trial court's interpretation of a restrictive covenant de novo." See Buckner v. Lakes of Somerset Homeowners Ass'n , 133 S.W.3d 294, 297 (Tex. App.-Fort Worth 2004, pet. denied). Before this Court, Tarr argues that if a deed restriction does not expressly address or restrict a certain property use, that usage must be permitted. Accordingly, short-term rentals must be permitted because the Timberwood Park Unit III's deeds remain silent as to short-term rentals. Tarr further contends that a deed restriction forbidding business purposes and permitting only residential purposes does not alter the permissibility of renting property in Timberwood for short durations of time. Meanwhile, the association interprets the restrictive covenants as prohibiting owners from using their tracts for any purpose other than single-family, residential use, which does not encompass Tarr's short-term rentals as that is a business, transient, multi-family use. It employs a "liberal" reading of the covenants and reasons that short-term rentals are not residential because the individuals occupying the home do not satisfy the definition of "residence" that it advances: physical presence for a substantial period of time coupled with an intent to remain. Both parties, however, maintain that the restrictive covenants they rely on are unambiguous.
A
The parties arrive at their divergent interpretations of the restrictive covenants by employing different mechanisms to give effect to the drafters' intent. In Tarr's view, restrictive covenants must be strictly construed as they historically were at common law. The association contends, on the other hand, that the legislature superseded the common-law rule when it adopted Texas Property Code section 202.003(a), calling for restrictive covenants to be liberally construed.
"A 'restrictive covenant' is a negative covenant that limits permissible uses of land." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.3(3) ( AM. L. INST. 2000). Such covenants limit the use an owner or occupier of land can make of their property. See id. cmt. e; see also TEX. PROP. CODE § 202.001(4) (defining "[r]estrictive covenant"). "The freedom to restrict the use of land gives individuals the ability to control land in a manner in which they deem to be socially preferable. The use of restrictive covenants to control the use of land has its roots as far back as sixteenth century England." David A. Johnson, One Step Forward, Two Steps Back: Construction of Restrictive Covenants After the Implementation of Section 202.003 of the Texas Property Code , 32 TEX. TECH L. REV. 355, 358 (2001) (footnote omitted).
"The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal." Curlee v. Walker , 112 Tex. 40, 244 S.W. 497, 498 (1922). And while our jurisprudence does not favor restraints on the free use of land, we have previously acknowledged that restrictive covenants can enhance the value of real property. See Davis v. Huey , 620 S.W.2d 561, 565 (Tex. 1981). Accordingly, when land is sold, the agreed-to covenants "enter[ ] into and become[ ] a part of the consideration." Curlee , 244 S.W. at 498 (quoting *280 Hooper v. Lottman , 171 S.W. 270, 272 (Tex. Civ. App.-El Paso 1914, no writ) ). "The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots." Id. (quoting Hooper , 171 S.W. at 272 ). Consequently, the covenant "between the original owner and each purchaser is ... mutual." Id. (quoting Hooper , 171 S.W. at 272 ).
So the courts have always treated unambiguous covenants "as valid contracts between individuals." Johnson, supra , at 356; see also Ski Masters of Tex., LLC v. Heinemeyer , 269 S.W.3d 662, 668 (Tex. App.-San Antonio 2008, no pet.) ("A restrictive covenant is a contractual agreement between the seller and the purchaser of real property."). Therefore, "restrictive covenants are subject to the general rules of contract construction." Pilarcik v. Emmons , 966 S.W.2d 474, 478 (Tex. 1998). Whether a restrictive covenant is ambiguous is a question of law for the court to decide by looking at "the covenants as a whole in light of the circumstances present when the parties entered the agreement." Id. ; see also Coker v. Coker , 650 S.W.2d 391, 394 (Tex. 1983). "Like a contract, covenants are 'unambiguous as a matter of law if [they] can be given a definite or certain legal meaning." Pilarcik , 966 S.W.2d at 478 (alteration in original) (first quoting Grain Dealers Mut. Ins. Co. v. McKee , 943 S.W.2d 455, 458 (Tex. 1997) ; and then citing Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd. , 940 S.W.2d 587, 589 (Tex. 1996) ). However, "if the covenants are susceptible to more than one reasonable interpretation, they are ambiguous." Id. "Mere disagreement over the interpretation of a restrictive covenant does not render it ambiguous." Buckner , 133 S.W.3d at 297.
A paramount concern when construing covenants is giving effect to the objective intent of the drafters of the restrictive covenant as it is reflected in the language chosen. See Wilmoth v. Wilcox , 734 S.W.2d 656, 658 (Tex. 1987) ; see also Owens v. Ousey , 241 S.W.3d 124, 129 (Tex. App.-Austin 2007, pet. denied). Accordingly, "[c]ourts must examine the covenants as a whole in light of the circumstances present when the parties entered the agreement," Pilarcik , 966 S.W.2d at 478, giving the "words used in the restrictive covenant ... the meaning which they commonly held as of the date the covenant was written, and not as of some subsequent date." Wilmoth , 734 S.W.2d at 658. Moreover, the words in a covenant "may not be enlarged, extended, stretched or changed by construction." Id. at 657 ; accord Buckner , 133 S.W.3d at 297. And courts should avoid any "construction that nullifies a restrictive covenant provision." Pilarcik , 966 S.W.2d at 479.
Our courts enforce these private agreements subject to certain well-established limitations. For instance, it must "appear[ ] that a general building scheme or plan for the development of a tract of land has been adopted, designed to make it more attractive for residential purposes by reason of certain restrictions to be imposed on each of the separate lots sold." Curlee , 244 S.W. at 498 (quoting Hooper , 171 S.W. at 272 ). Moreover, we have continuously called for a covenant's enforcement if it is "confined to a lawful purpose and [is] within reasonable bounds and the language employed is clear." Davis , 620 S.W.2d at 565. But we have also noted that "covenants restricting the free use of property are not favored," ids="9975836" index="40" url="https://cite.case.law/sw2d/620/561/#p565">id. , because "[t]he right of individuals to use their own property as they wish remains one of the most fundamental rights that individual property owners possess." Johnson, supra , at 356. As such, we have limited this mandate to enforce restrictive covenants to instances where purchasers of real property buy "with actual or constructive *281 knowledge of the scheme, and the covenant was part of the subject-matter of his purchase." Curlee , 244 S.W. at 498 (quoting Hooper , 171 S.W. at 272 ). If, however, one "purchases for value and without notice," he "takes the land free from the restriction." Davis , 620 S.W.2d at 566. Whether the purchaser had notice "is determined at the date of the inception of the general plan or scheme," which is the time at which the restrictions were filed in the county's property records. Id. at 567.
For those reasons, courts nationwide have long afforded restrictive covenants a narrow interpretation.[2] For example, the Kansas Supreme Court has explained:
The rules governing the construction of covenants imposing restrictions on the use of realty are the same as those applicable to any contract or covenant, including the rule that, where there is no ambiguity in the language used, there is no room for construction, and the plain meaning of the language governs. When construction is necessary, the language used will be given its obvious meaning.
Another well-settled rule is that covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction. Doubt will be resolved in favor of the unrestricted use of property.
Sporn v. Overholt , 175 Kan. 197, 262 P.2d 828, 830 (1953) (citation omitted). Thus, the court explained that the construction of a covenant will not preclude any property use that is "not plainly prohibited" by the restriction's clear language. Id. (quoting Bear v. Bernstein , 251 Ala. 230, 36 So.2d 483, 484 (1948) ).
Like those jurisdictions, "the courts in Texas have approached ... restrictive covenants with some skepticism." Johnson, supra , at 356. In 1925, this Court adopted an opinion of the Commission of Appeals, which relayed this interpretative standard:
Covenants or restrictive clauses in instruments concerning real estate must be construed strictly, favoring the grantee and against the grantor, and all doubts should be resolved in favor of the free and unrestricted use of the premises.
A reservation contained in an instrument of conveyance or lease which favors the grantor or lessor and tends to limit the free use of the premises by the grantee or lessee will not be enlarged by construction, but will be given effect according to the plain meaning and intent of the language used.
Settegast v. Foley Bros. Dry Goods Co. , 114 Tex. 452, 270 S.W. 1014, 1016 (1925).[3]
*282 Texas jurisprudence steadily adhered to this strict approach for decades. Indeed, fifty-six years after Settegast v. Foley Bros. Dry Goods Co. , this Court regarded these standards as "fundamental rules," which we linked with the requirement that a purchaser have notice of the limitations on his title:
Although covenants restricting the free use of property are not favored, when restrictions are confined to a lawful purpose and are within reasonable bounds and the language employed is clear, such covenants will be enforced. However, a purchaser is bound by only those restrictive covenants attaching to the property of which he has actual or constructive notice. One who purchases for value and without notice takes the land free from the restriction.
Davis , 620 S.W.2d at 565-66 (citation omitted). We reasoned that absent such notice, "it cannot be said that they entered into the scheme or assumed the mutual obligation." See id. at 567.
Despite these principles being well established, courts have often reached seemingly divergent holdings. These discrepancies initially arose from the factually specific nature of construing covenants and determining if the complained-of conduct was a violation of a specific covenant's prescriptions.[4] But the catalyst for the dissimilarities among cases may have changed in 1987 with the enactment of Texas Property Code section 202.003(a), which has caused many to doubt the common-law principles' vitality. Cf. Johnson, supra , at 363 ("Th[e] strict construction of restrictive covenants by the Texas courts continued directly up to the Texas Legislature's passage of Texas Property Code section 202.003(a) in 1987.").
In 1987, the legislature enacted House Bill 356 to "allow property owners to withdraw their signatures from a petition to modify" or terminate restrictive covenants "without lengthy and expensive litigation." House Comm. on Judicial Affairs, Bill Analysis, Tex. H.B. 356, 70th Leg., R.S. (1987). Among its provisions was a rule of construction, now codified at Texas Property Code section 202.003 : "A restrictive covenant shall be liberally construed to give effect to its purposes and intent." Act *283 of June 1, 1987, 70th Leg., R.S., ch. 712, § 1, 1987 Gen. Laws 2585, 2585 (codified at TEX. PROP. CODE § 202.003(a) ). Its application was given retroactive effect so that it applies to all covenants regardless of when they were created. TEX. PROP. CODE § 202.002(a).
With Texas Property Code section 202.003(a)'s promulgation, courts suddenly had extreme "difficulty in ascertaining and declaring the controlling general principles of the law,"cf. Hooper , 171 S.W. at 271, because they began to question whether this legislative enactment was an attempt to contravene our long-adhered-to common-law standards. See Johnson, supra , at 368, 372. And, unfortunately, "the legislature provided no explanation as to the motivations or necessity for ... change" to help guide our courts. Id. at 370. As a result, Texas' courts of appeals have grappled "with the varying standards established by the passage of section 202.003 and the historical common-law rules of construction" but "have been unable to determine any uniform standard for interpreting ambiguous restrictive covenants." See id. at 371-72.
Thirty-one years after the statute's enactment, our courts remain immersed in this debate.[5] And as in those courts, the parties here dispute what standard controls our analysis. Unsurprisingly, Tarr contends that section 202.003(a) did not alter the judicial restraint courts have historically exercised when interpreting covenants, so he advances that the common-law strict-construction requirement still governs.[6] Conversely, the association argues *284 that the statute trumps the common-law approach and that section 202.003(a) should be applied to covenants that succumb to the pitfalls of ambiguity. So, although the association contends that the deed restrictions are unambiguous, it argues in the alternative that even if they are ambiguous, section 202.003(a) should still govern this Court's review.[7]
We have not yet deliberated section 202.003(a)'s effect, if any, on the construction principles we have long employed to interpret restrictive covenants.[8] Nor do we *285 reach that decision today. We don't have to reconcile any potential conflict between section 202.003(a) and the common-law principles-or whether those common-law standards can ever again be appropriately employed-because our conclusion today would be the same regardless of which interpretative standard prevails. As explained below, the covenants at issue unambiguously fail to address the property use complained of in this case. No construction, no matter how liberal, can construe a property restriction into existence when the covenant is silent as to that limitation.[9] A day may come when we must choose between strictly or liberally construing restrictive covenants. But it is not this day. So we proceed to the merits.
B
Pertaining to the trial court's "multi-family" use holding, the association argues that the covenants prohibit the use of tracts in the subdivision for any purpose other than single-family residences and for residential purposes. And it maintains the trial court properly concluded that Tarr's use violated the "single-family, residential purpose" restriction because he has leased to parties who are not members of a single family. In response, Tarr argues that the single-family restriction simply limits the type of structure allowed rather than restricting use.[10]
In arguing that the deeds impose a single-family, residential-use restriction, the association has combined two separate covenants. Paragraph one of the Timberwood Park Unit III subdivision's deeds provides:
1. All tracts shall be used solely for residential purposes, except tracts designated on the above mentioned plat for business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful *286 by reason of odor, dust, smoke, gas fumes, noise or vibration ....
That covenant does not set forth any provisions pertaining to single-family uses or residences. Instead, that limitation is imposed by paragraph three:
3. No building, other than a single family residence containing not less than 1,750 square feet, exclusive of open porches, breezeways, carports and garages, and having not less than 75% of its exterior ground floor walls constructed of masonry, i.e., brick, rock, concrete, or concrete products shall be erected or constructed on any residential tract ... and no garage may be erected except simultaneously with or subsequent to erection of residence. No less than a 300 lb. per square asphalt or fiberglass shingle shall be used in any construction in Timberwood Park Unit III.
Although the association is correct that the deeds mention both single-family residences and mandate a residential purpose, to combine those provisions into one mega-restriction is a bit of a stretch. Both the context in which those provisions arise and the case law construing similar covenants demonstrate that those restrictions must be read as separate and distinct.
In discerning the drafters' intent, courts must "consider whether the covenant's restrictions apply to the use of the building or to the nature of the physical structure" to be erected on the property. Thomas F. Guernsey, The Mentally Retarded and Private Restrictive Covenants , 25 WM. & MARY L. REV. 421, 426 (1984). Accordingly, courts have often distinguished between use restrictions and structural restrictions and have declined to conflate the two. See, e.g. , 1733 Estates , 485 N.W.2d at 340-41.
Indeed, in Stephenson v. Perlitz , this Court held, "A restriction that property is for residence purposes is quite different from a restriction which additionally provides that only one residence may be erected on the property." 532 S.W.2d at 956. So, we continued, where tracts are limited to residential uses, the covenants require merely that the property be used for "living purposes"; they did not also impart a prohibition against duplex or apartment housing. Id. at 955 (citation omitted). Stephenson 's holding is particularly relevant in this case as it came just three years before the Timberwood deeds were recorded. See Pilarcik , 966 S.W.2d at 478 (requiring courts to "examine the covenants as a whole in light of the circumstances present when the parties entered the agreement"); Wilmoth , 734 S.W.2d at 658 (giving "words used in the restrictive covenant ... the meaning which they commonly held as of the date the covenant was written, and not as of some subsequent date").
Permian Basin Centers for Mental Health & Mental Retardation v. Alsobrook is also instructive. 723 S.W.2d at 774. In that case, the court of appeals interpreted separate covenants, one of which provided the tracts "shall be known and described as residential lots, except[ ] ... [those] designated as commercial lots." Id. at 775. The second paragraph provided: "No structures shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling, not to exceed two stories in height[ ] ...." Id. The court held that "single-family dwelling" referred "only to the type of structure that may be built on the property," which was the interpretation that was "more reasonable and more in keeping with what was intended by the original grantor." Id. at 776. It analyzed the two different paragraphs as follows:
The paragraph in which the term "single-family dwelling" appears deals with the character of structures that may be *287 "erected, altered, placed or permitted to remain on any residential building plot." There is no mention in this or any other paragraph of the covenant that seeks to impose a single-family occupancy requirement. The only "use" provisions in the covenant distinguish between commercial and residential use and prohibit the use of outbuildings as residences.
Id. The court concluded the restrictive covenant "limits the use of the property to residential purposes, and the term 'single-family dwelling' limits the residential use to single-family structures-that is, homes designed for single families as opposed to duplexes or apartment buildings." Id. at 777.
Likewise, the limitations in Tarr's deeds are set forth in separate paragraphs that speak to distinct restrictions. Like the covenants in Permian Basin , paragraph three of the Timberwood deed describes structural or architectural limitations by specifying that the building "erected or constructed" upon a tract must be a "single family residence," specifying the minimum square footage of such a building, and the materials of which it shall be constructed. The only instance in which the deed imposes the single-family restriction is in this structural limitation. Conversely, paragraph one speaks to how owners in the subdivision may permissibly use their property. It limits their use to "residential purposes" as contradistinguished from "business purposes." It remains silent as to whether so-called "multi-family" use is permitted. Other use provisions in the deed-which speak to dumping garbage and breeding animals on tracts, for example-also fail to restrict owners' use to single-family purposes.
We cannot ignore the context in which these limitations are imposed and conflate the two paragraphs. See Boatner v. Reitz , No. 03-16-00817-CV, 2017 WL 3902614, at *5 (Tex. App.-Austin Aug. 22, 2017, no pet.) (mem. op.) ("The references in the deed restrictions to the terms 'single family' and 'dwelling,' however, are in the context of the building requirements for the main structure on the property as compared with the provision addressing the 'use' of the property."); see also 1733 Estates , 485 N.W.2d at 340 (defining "residential purposes" as a limit on "the way the property is used" while "[s]ingle-family dwelling" limits "the type of building which may be constructed and not to the use of such building"). The single-family residence restriction merely limits the structure that can properly be erected upon Tarr's tract and not the activities that can permissibly take place in that structure.[11] The parties do not dispute that Tarr's tract contains a single-family residence, so he has not violated the single-family-residence restriction. Because the single-family-residence limitation is not relevant to the short-term rentals at issue, we turn to *288 the question of whether paragraph one-the paragraph restricting use-bars such activity.
C
The "use" restriction in paragraph one of Tarr's deed provides: "All tracts shall be used solely for residential purposes, except tracts designated on the above mentioned plat for business purposes[ ] ...." The court of appeals held that the covenant unambiguously restricted Tarr's short-term-rental use because use of the word "residence" connotes a "physical presence and an intention to remain." 510 S.W.3d at 730 (quoting Munson , 948 S.W.2d at 816 ). Distinguishing between "residential purposes" and "transient purposes," the court concluded that a homeowner who leases "his home to be used for transient purposes" violates the covenant that limits the use of his tract to "solely ... residential purposes."[12] Id.
Tarr argues that "residential purposes" must be read in comparison to "business purposes," focusing on the activities in which the people in possession of the property partake. So Tarr juxtaposes activities such as eating, sleeping, praying, and watching TV with activities such as blacksmithing, shop-tending, event-hosting, and automobile repair. In addition, Tarr refutes that duration of use can be considered in conjunction with the character of the use; "residential purposes" does not in and of itself differentiate between owner occupancy and tenant occupancy or imply duration limits on either. As for the "business purpose" prohibition in the covenant, Tarr contends that merely renting one's property or realizing a profit therefrom does not convert a homeowner's use into a business use. And if it did, he argues, then long-term leasing arrangements would likewise be forbidden. Because these covenants often remain silent as to the minimum amount of time one must use a home for it to qualify as a residential use, Tarr questions the soundness of cases that impose ninety-day limitations, require physical, permanent occupancy, or examine an intent to remain. Instead, Tarr urges this Court to conclude that because the covenants are silent as to leasing arrangements or minimum-duration-of-use requirements, such activities are permissible-as what is not expressly proscribed is allowed. This construction, Tarr insists, best effectuates the original grantor's purpose and intent.
The association, on the other hand, focuses on the transient and temporary nature of Tarr's renters' use of the property. Because the tenants have no intent to remain beyond the short term for which they have leased the property, their use is merely transient as opposed to residential. To support this definition of "residential," the association relies upon various Texas and federal regulatory definitions of "residence." So the association not only contrasts "residential purpose[s]" with "business purposes," but also with "transient purposes." And as proof that Tarr's use is a business use, the association notes that he pays hotel taxes and that he formed an LLC to manage the property.
As noted above, when interpreting a restrictive covenant, courts must first determine whether the covenant is ambiguous by looking to the "covenant[ ] as a whole in light of the circumstances present when *289 the parties entered the agreement." Pilarcik , 966 S.W.2d at 478. A covenant is ambiguous if it is "susceptible to more than one reasonable interpretation," but it is unambiguous if it can be afforded "a definite or certain legal meaning." Id. (citations omitted). Whether a covenant is ambiguous is a question of law for the court to decide. Id.
First, we will examine the covenant to determine the relevant activity at issue. As we noted above, " 'residential purpose' refers to the way the property is used." 1733 Estates , 485 N.W.2d at 340. But one must inquire whether the covenant's language focuses upon the owner's use of the property or upon the activity that actually takes place on the land. If the suitable probe is how the owner is using the property, Tarr could be said to have violated the provision by establishing an LLC and generating income from his property. We note, however, the covenant here provides that the tract "shall be used solely for residential purposes, except tracts designated ... for business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful." By referring to the activities "conducted on " the tracts, the covenant expressly makes the relevant inquiry the conduct taking place on the physical property itself (as opposed to how the owner is using the property). Viewing the use taking place on the property as the relevant measure accords with the views adopted by other states' courts that have decided this issue. See, e.g. , Dunn v. Aamodt , No. 3:10-CV-03119, 2012 WL 137463, at *3 (W.D. Ark. Jan. 18, 2012) ; Slaby v. Mountain River Estates Residential Ass'n , 100 So.3d 569, 579, 581 (Ala. Civ, App. 2012) ; Houston v. Wilson Mesa Ranch Homeowners Ass'n , 2015 COA 113, ¶¶ 23-24, 360 P.3d 255 ; Santa Monica Beach Prop. Owners Ass'n v. Acord , 219 So.3d 111, 115 (Fla. Dist. Ct. App. 2017).
Turning to the meaning of "residential purpose," we initially note that the Timberwood covenants do not provide a definition of either "residential purpose" or "business purpose." This lack of direction from the deeds themselves is especially problematic because "residence" is a term "of multiple meanings." 20 AM. JUR. 2D Covenants § 179 (2018). Often, however, the appropriate meaning can be discerned from "the context in which it is used." Id. Still, even when context is taken into account, ambiguity sometimes rears its head. As a Colorado court explained:
Although "residential" unambiguously refers to use for living purposes, courts have recognized ambiguity in the term in cases involving short-term rentals or other situations where those residing in the property are living there only temporarily, not permanently....
Other courts have found no ambiguity, reasoning that, as long as the property is used for living purposes, it does not cease being "residential" simply because such use is transitory rather than permanent.
Houston , 2015 COA 113, at ¶¶ 17-18, 360 P.3d 255 (citations omitted). Whether a covenant is ambiguous must be determined based upon the plain language set forth in the covenant as seen in light of the circumstances present when it was drafted. Cf. Pilarcik , 966 S.W.2d at 478. And courts sometimes too quickly conclude that a term is ambiguous:
Some words have two or more quite different meanings.... More commonly, however, the interpretive issue involves not which of two totally different meanings is intended but what level of generality is to be accorded to a single meaning. In writings on the interpretation of texts, the loose norm is to refer to all uncertainties of meaning as ambiguities .
*290 But there is a useful and real distinction between textual uncertainties that are the consequence of verbal ambiguity (conveying two very different senses, as when table could refer either to a piece of furniture or to a numerical chart) and those that are the consequence of verbal vagueness (as when equal protection of the laws can be given a scope so narrow as to include only protection from injury, or so broad as to include equal access to government benefits). A word or phrase is ambiguous when the question is which of two or more meanings applies; it is vague when its unquestionable meaning has uncertain application to various factual situations.
ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 31-32 (2012). In other words, if a court can assign a meaning to "residential purposes," the term is not rendered ambiguous solely because the application of "its unquestionable meaning" to a certain factual situation is "uncertain" or "vague." See id.
We note again that the Timberwood deeds do not provide definitions of "residential" or "business" purpose; so we must give those words "the meaning which they commonly held as of the date the covenant was written." Wilmoth , 734 S.W.2d at 658 ; see also ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 89 (2012) ("The choice is this: Give text the meaning it bore when it was adopted, or else let every judge decide for himself what it should mean today."). In 1969, in MacDonald v. Painter , we construed a clause that forbade using tracts for "mercantile business" and permitted only "residence purposes." 441 S.W.2d 179, 180 (Tex. 1969). We held: "The terms 'residence purposes,' and 'residences' require the use of property for living purposes as distinguished from uses for business or commercial purposes." Id. at 182.[13] Similarly, American Jurisprudence provides this explanation for the phrase:
Generally speaking, "residential use" is one that involves activities generally associated with a personal dwelling. Similarly, a "residential building" is a building which is used for residential purposes or in which people reside, dwell, or make their homes, as distinguished from one which is used for commercial or business purposes. The phrase "residential purposes" does not mean only the occupying of a premises for the purpose of making it one's "usual" place of abode; a building is a residence if it is "a" place of abode.
20 AM. JUR. 2D Covenants § 179 (2018) (footnotes omitted). The use of the phrase "residential purposes" in the Timberwood deeds comports with these interpretations. The restrictive covenant in this case effectively defines "residential purposes" by juxtaposing it to "business purposes"-the use it expressly forbids.
The covenants in the Timberwood deeds fail to address leasing, use as a vacation home, short-term rentals, minimum-occupancy durations, or the like. They do not require owner occupancy or occupancy by a tenant who uses the home as his domicile. Instead, the covenants merely require that the activities on the property comport *291 with a "residential purpose" and not a "business purpose." We decline to add restrictions to the Timberwood covenants by adopting an overly narrow reading of "residential." "Without some indication to the contrary, general words (like all words, general or not), are to be accorded their full and fair scope. They are not to be arbitrarily limited." Id. at 101.
For this reason, we disapprove of the cases that impose an intent or physical-presence requirement when the covenant's language includes no such specification and remains otherwise silent as to durational requirements. See generally Benard v. Humble , 990 S.W.2d 929 (Tex. App.-Beaumont 1999, pet. denied) (affirming the trial court's interpretation of "single-family residence purposes" as prohibiting "renting for a period of less than ninety days" even though the covenants did "not explicitly contain language covering temporary renting of property"). Even if we were to afford the covenant a liberal construction, we cannot erect limitations on the homeowners' use of property of which they had no notice. See Davis , 620 S.W.2d at 566 (relieving property owners of restrictions if they purchased "for value and without notice" of the limitation on their property use); cf. Mason Family Tr. v. DeVaney , 146 N.M. 199, 207 P.3d 1176, 1178 (N.M. Ct. App. 2009) ("In the context of a residential subdivision, we interpret a dwelling purpose to be use as a house or abode, and once a proper use has been established, we do not attach any requirement of permanency or length of stay."). We do not imbue general phrases with a meaning not even raised by implication. See ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("Nothing is to be added to what the text states or reasonably implies .... That is, a matter not covered is to be treated as not covered."). Nevertheless, we confine this interpretation to the unambiguous language of these particular restrictive covenants. We recognize that another court may reach a different conclusion if the covenant it reviews defines "residential" or "business" uses by specifically enumerating prohibited conduct. See, e.g. , Munson , 948 S.W.2d at 815 (analyzing a covenant that defined "business use" to include "[m]otel, tourist courts, and trailer parks").
Affording these phrases their general meanings and interpreting the restrictions as a whole, we hold that so long as the occupants to whom Tarr rents his single-family residence use the home for a "residential purpose," no matter how short-lived, neither their on-property use nor Tarr's off-property use violates the restrictive covenants in the Timberwood deeds.[14]
*292 Moreover, Tarr's use does not qualify as a commercial use.[15] Accordingly, as the association failed to adduce any evidence that Tarr's tenants have used the property in any manner inconsistent with a residential purpose, summary judgment for the association was improper.
* * *
We hold that Tarr has not violated the Timberwood restrictive covenants by entering into short-term vacation rental agreements. Accordingly, the trial court should not have entered summary judgment for the association, and the court of appeals erred in affirming the trial court's judgment. We reverse and remand the case to the trial court for proceedings consistent with this opinion.

In its brief, the association now denies ever imposing these fines. However, the record, including the letters the association's board sent to Tarr, indicate otherwise.

See, e.g. , Stephenson v. Perlitz , 532 S.W.2d 954, 956 (Tex. 1976) (recognizing that other courts have found specific covenants ambiguous, and thus applying a "long-standing rule of construction" that adopts the interpretation that "least restricts the free use of the land" (quoting Houk v. Ross , 34 Ohio St.2d 77, 296 N.E.2d 266, 275 (1973) ) ); see also Wood v. Blancke , 304 Mich. 283, 86" url="https://cite.case.law/citations/?q=8%20N.W.2d%2067">8 N.W.2d 67, 69 (1943) ("Restrictive covenants in deeds are construed strictly against grantors and those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property."); 1733 Estates Ass'n v. Randolph , 1 Neb.App. 1, 485 N.W.2d 339, 340 (1992) ("[C]ovenants restricting the use of property are not favored in law. If restrictive covenants are ambiguous, they will be construed in a manner permitting the maximum unrestricted use of the property." (citation omitted) ); Hunt v. Held , 90 Ohio St. 280, 107 N.E. 765, 766 (1914) ("[I]t is a well-settled rule that in construing deeds and instruments containing restrictions and prohibitions as to the use of property conveyed[,] all doubts should be resolved in favor of the free use thereof for lawful purposes in the hands of the owners of the fee.").

Six years after our 1925 decision, the Amarillo court of civil appeals explained the skepticism with which courts view the application of restrictive covenants:
In this country[,] real estate is an article of commerce. The uses to which it should be devoted are constantly changing as the business of the country increases, and as its new wants are developed. Hence, it is contrary to the well-recognized business policy of the country to tie up real estate where the fee is conveyed with restrictions and prohibitions as to its use; and, hence, in the construction of deeds containing restrictions and prohibitions as to the use of the property by a grantee, all doubts should, as a general rule, be resolved in favor of a free use of property and against restrictions.
Ragland v. Overton , 44 S.W.2d 768, 771 (Tex. App.-Amarillo 1931, no writ) (quoting 4 Thompson on Real Property § 3361). We adopted this statement a decade later and explained: "Being in derogation of the fee conveyed by the deed, if there be any ambiguity in the terms of the restrictions, or substantial doubt of its meaning, the ambiguity and doubt should be resolved in favor of the free use of the land." Baker v. Henderson , 137 Tex. 266, 153 S.W.2d 465, 467 (1941).

See Hooper , 171 S.W. at 271 ("[A]s may be anticipated, from the very nature of the topic [of restrictive covenants,] the cases abound in fine and subtle distinctions. Many of the decisions upon this branch of the law appear to be in hopeless conflict, but are usually reconcilable when the facts peculiar to each are understood. In fact, the courts seem to have had no special difficulty in ascertaining and declaring the controlling general principles of the law, but, in their application to concrete facts, it may well be said that the decisions are in hopeless conflict and confusion, and individual cases are without value as precedents, except as general principles are recognized and declared.").

One court described the hesitation in electing which standard to utilize as follows:
Some courts of appeals have recognized that the common-law requirement of construing restrictions strictly and section 202.003(a)'s requirement of construing residential covenants liberally to effectuate their purposes and intent might appear contradictory. As a result, some courts of appeals have held or implied that section 202.003(a)'s liberal-construction rule concerning residential covenants supersedes the common-law rule of strict construction. In contrast, other courts of appeals, including ours, have concluded that there is no discernable conflict between the common law and section 202.003(a). Even among the courts that believe that the common law and section 202.003(a) can be reconciled, there exists a split in how to apply section 202.003(a). Some of these courts, including ours, have simply continued to apply the common-law rule without a precise explanation of how to reconcile it with section 202.003(a). Other courts of appeals have held that the common-law rule applies only when there is an ambiguity concerning the drafter's intent, but to determine if such an ambiguity exists, these courts first apply section 202.003(a)'s liberal-construction mandate.
Finally, ... some courts of appeals since 1987 have simply continued applying the common-law strict-construction rule without referring to section 202.003(a) at all. Others, including ours, have applied section 202.003(a)'s liberal-construction standard without referring to the common-law construction principles at all.
Uptegraph v. Sandalwood Civic Club , 312 S.W.3d 918, 926-27 (Tex. App.-Houston [1st Dist.] 2010, no pet.) (footnotes omitted). And as exemplified by that passage, the divide is even engrained within single appellate courts, resulting in contradictory standards being applied in various opinions issued by the same court of appeals. See ids="7326000" index="96" url="https://cite.case.law/sw3d/312/918/#p926">id.

Tarr argues that the common-law rule protects property rights against deed restrictions that are either unclear or silent as to the permissibility of certain activities. In addition, he raises concerns pertaining to ambiguity, constitutionality, and homeowners' autonomy. First, Tarr notes that none of the appellate decisions "explain what 'liberal' means." Thus, he argues the statute's use of that term is ambiguous. And he posits that the statute may be unconstitutionally vague as it may violate due process if and when it subjects property owners to unfair enforcement actions. This is so because what constitutes a "liberal" reading of a covenant is too subjective and can potentially deprive an owner of their freedom to make certain uses of their property. In an attempt to illustrate this point, Tarr notes that when purchasing a parcel subject to a residential-use limitation, the buyer would not be able to discern restrictions on their ability to rent the property and the applicable minimum duration of that lease. But he concedes the constitutionality issue may not be ripe for review, so we do not analyze that contention. See San Antonio Gen. Drivers, Helpers Local No. 657 v. Thornton , 156 Tex. 641, 299 S.W.2d 911, 915 (1957) ("A court will not pass on the constitutionality of a statute if the particular case before it may be decided without doing so."). Finally, Tarr argues that any questions about how restrictions are to be applied should be left to the members of homeowners' associations who can amend their property restrictions. To liberally construe deed restrictions in a way that expands the restrictions' reach and that impairs the free use of property would usurp the property owners' power to self-govern. Such a usurpation, Tarr argues, diminishes both the owners' property rights and their freedom to contract.

Notably, this contravenes many courts' approaches. Compare Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A. , 956 S.W.2d 749, 752 (Tex. App.-Houston [14th Dist.] 1997, pet. denied) (" '[T]he covenant should not be hedged about with strict construction, but given a liberal construction to carry out its evident purpose.' This rule of construction ... applies to all restrictive covenants." (alteration in original) (quoting Candlelight Hills Civic Ass'n v. Goodwin , 763 S.W.2d 474, 477 (Tex. App.-Houston [14th Dist.] 1988, writ denied) ) ), with Jennings v. Bindseil , 258 S.W.3d 190, 195 (Tex. App.-Austin 2008, no pet.) ("When the language of a restrictive covenant is unambiguous, the Texas Property Code requires that the restrictive covenant be liberally construed .... However, if the language is found to be ambiguous, [it] is construed strictly against the party seeking to enforce the restriction, and all doubts must be resolved in favor of the free and unrestricted use of the property." (citation omitted) ). But the association notes that section 202.003(a) does not confine its applicability to unambiguous covenants. And nor should it in the association's point of view. Since an unambiguous covenant can be strictly construed according to its plain language, a liberal construction is not required. Instead, it alleges that the legislative mandate to liberally construe restrictive covenants governs the interpretation of ambiguous deed restrictions that cannot be strictly construed.

"The Texas Supreme Court has noted, but not yet resolved, the potential conflict between the common law and section 202.003(a)." Uptegraph , 312 S.W.3d at 927. House Bill 364 was signed into law on June 18, 1987. See Act of June 1, 1987, 70th Leg., R.S., ch. 712, § 1, 1987 Gen. Laws 2585, 2585 (codified at Tex. Prop. Code § 202.003(a) ). A few weeks later, this Court had to interpret restrictive covenants in Wilmoth v. Wilcox . See 734 S.W.2d 656. In doing so, however, we did not reference the legislature's recent call for a liberal construction. See generally id. Instead, we simply turned to the common-law mandates. See id. at 657-58 ("[W]e note that covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are clearly worded, they will be enforced. All doubts must be resolved in favor of the free and unrestricted use of the premises, and the restrictive clause must be construed strictly against the party seeking to enforce it." (citations omitted) ). On September 16, 1987, two months after the Property Code amendments, we denied rehearing. Id. at 656.
Eleven years later, we acknowledged section 202.003(a)'s promulgation. In Pilarcik v. Emmons , the parties debated what standards controlled the covenants' interpretation with one side advancing the common-law rules and the other calling for a liberal construction pursuant to section 202.003(a). See 966 S.W.2d at 478. After noting this dispute, we recounted general principles without mentioning the common-law rules. See id. We never determined whether the statutory liberal construction or the common-law strict construction controlled the interpretation of restrictive covenants. See generally ids="11833909" index="109" url="https://cite.case.law/sw2d/966/474/#p478">id. at 478-79. Instead, we held the covenants at issue were unambiguous and decided the case by merely analyzing the drafters' intent. See ids="11833909" index="110" url="https://cite.case.law/sw2d/966/474/#p478">id.

See Waterford Harbor Master Ass'n v. Landolt , No. 14-13-00817-CV, 2015 WL 293262, at *6 (Tex. App.-Houston [14th Dist.] Jan. 22, 2015, pet. denied) (mem. op.) (declining to rewrite a covenant "or add to its language under the guise of interpretation," and instead electing to "enforce it as written"); Hollis v. Gallagher , No. 03-11-00278-CV, 2012 WL 3793288, at *7 (Tex. App.-Austin Aug. 28, 2012, no pet.) (mem. op.) ("Courts[ ] ... may not 'liberally' construe a restrictive covenant to say something that it plainly does not say." (citations omitted) ); Hicks v. Falcon Wood Prop. Owners Ass'n , No. 03-09-00238-CV, 2010 WL 3271723, at *7 (Tex. App.-Austin Aug. 19, 2010, no pet.) (mem. op.) ("[T]o say that an unambiguous restrictive covenant is to be 'liberally construed' does not mean that it necessarily restricts the land use in dispute-the covenant, properly construed, may unambiguously state otherwise."); Hodas v. Scenic Oaks Prop. Ass'n , 21 S.W.3d 524, 528 (Tex. App.-San Antonio 2000, pet. denied) ("If a phrase or covenant is so worded that we can give it a certain legal meaning, it is not ambiguous, and we will construe it as a matter of law, giving effect to the objective intent of the drafter as expressed or as is apparent in the provision."); Permian Basin Ctrs. for Mental Health & Mental Retardation v. Alsobrook , 723 S.W.2d 774, 776 (Tex. App.-El Paso 1986, writ ref'd n.r.e.) ("A restrictive covenant that is clear and unambiguous[ ] ... can be enforced as written, but it cannot be enlarged by interpretation."); see also Bear , 36 So.2d at 484 ("[C]ourts should not extend, by construction, the restraint beyond its proper scope by writing into it what is not clearly inhibited.").

Tarr further notes the lack of evidence that the tenants were members of multiple families. Instead, the evidence concerned only the number of occupants and did not identify how, or even whether, they were related to each other.

Notably, by considering the covenant's context and the meaning afforded to such a covenant in 1979, we would reach this interpretation regardless of whether we strictly or liberally construed it. See Wilmoth , 734 S.W.2d at 657-58 ("[T]he restrictive clause must be construed strictly against the party seeking to enforce it. The words used in the restriction, and the restriction as a whole, may not be enlarged, extended, stretched or changed by construction.... The words used ... must be given the meaning which they commonly held as of the date the covenant was written[ ] ...." (citations omitted) ); Liberal Interpretation , Black's Law Dictionary (10th ed. 2014) (explaining a liberal interpretation is one that broadly interprets "a text in light of the situation presented ... with the object of effectuating the spirit and broad purpose of the text" (emphasis added) ); see also Stephenson , 532 S.W.2d at 956 (deciding in 1976 that "[a] restriction that property is for residence purposes is quite different from a restriction which additionally provides that only one residence may be erected on the property").

In doing so, the court of appeals rejected the interpretation the Austin court of appeals afforded a similar covenant. 510 S.W.3d at 731 (citing Zgabay v. NBRC Prop. Owners Ass'n , No. 03-14-00660-CV, 2015 WL 5097116, at *3 (Tex. App.-Austin Aug. 28, 2015, pet. denied) (mem. op.) ). The Austin court concluded that the covenant was ambiguous and strictly construed it, as the common law requires. Zgabay , 2015 WL 5097116, at *3.

Likewise, the Galveston court of appeals construed a provision with a residential-use restriction this way: "The word 'residential' as used in a covenant restricting the use of property, is used in contradistinction to 'business' or 'commerce.' A building used as place of abode, and in which no business is carried on, is devoted to a 'residential use' so long as such use continues." Briggs v. Hendricks , 197 S.W.2d 511, 513 (Tex. Civ. App.-Galveston 1946, no writ), quoted in Vaccaro v. Rougeou , 397 S.W.2d 501, 503 (Tex. Civ. App.-Houston 1965, writ ref'd n.r.e.).

Facing similar questions, other states' courts have reached similar conclusions. For example, in 2003, the Idaho Supreme Court decided Pinehaven Planning Board v. Brooks , which implicated covenants providing that residential tracts may only contain one single-family dwelling and forbidding any "commercial or industrial ventures or business." 138 Idaho 826, 70 P.3d 664, 665 (2003). The court held that the covenants unambiguously permitted "the rental of residential property for profit" because leasing "the property for residential purposes, whether short or long-term does not fit within" the covenants' prohibitions. Id. at 667-68. The short-term renters partook in activities reflecting a residential purpose because they used "it for the purposes of eating, sleeping, and other residential purposes," which was not a use that violated the commercial and business activity proscriptions. Id. at 668.
Relying on Pinehaven in part, an Alabama court of appeals analyzed analogous covenants and ultimately reached a similar conclusion. In Slaby v. Mountain River Estates Residential Association , the property's use was limited to "single family residential purposes only," and "commercial, agricultural or industrial use[s]" were expressly prohibited. 100 So.2d at 571. In an attempt to give effect to the phrase "single family residence purposes only," the court first noted that "the restrictive covenant does not require that the cabin be exclusively 'owner-occupied' or the like, so they 'are not constrained in the character of their residential use of the property by the deed covenants.' " Id. at 577 (citations omitted). Thus, the court adopted the majority view and held that "property is used for 'residential purposes' when those occupying it do so for ordinary living purposes.... [S]o long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities, ... they are using the cabin for residential purposes." Id. at 579. Holding otherwise, the court recognized, would mean that unless property owners use their property "as their primary residences," they would be violating similar covenants, even where the owners themselves use the residence as a vacation home. Id. Consequently, the court decided that "the term 'residential purposes' does not mean only 'occupying of a premises for the purpose of making it one's usual place of abode.' " Id.
Moreover, although Tarr did generate revenue off his property in Timberwood, we also agree with our sister courts nationwide and hold that Tarr did not violate the covenants solely by receiving income from using his property to facilitate his short-term-rental endeavor. However, because the relevant inquiry, under this specific covenant, is the activity taking place on the lot itself, this decision might differ if Tarr furthered his profit-generating-venture on the Timberwood tract itself. As the Alabama court explained:
[N]o mercantile or similar activity occurs at the cabin. The actual renting of the cabin, and any financial transactions associated therewith, occurs off-site. The [owners] do not solicit renters on-site, but do so through the Internet, where potential tenants can view the premises without actually going there. While occupying the cabin, the tenants must cook and clean for themselves and they do not receive any services from the [owners.] Although the [owners] remit a lodging tax, ... that fact does not detract from the conclusion that no commercial activity takes place on the premises.
Slaby , 100 So.3d at 580 (citation omitted).

Other state courts have measured the commercial or business purposes, when defined in contradistinction to residential purposes, by examining whether the use involved employees or other indicia of business on the tract itself. See, e.g. , Santa Monica , 219 So.3d at 115 (distinguishing another case that involved an inn that "had a number of indicia of a business, such [as] a manager to 'control the guests,' signs located on the property advertising it as a 'Bed and Breakfast Inn,' and five bedrooms each with a separate entrance to the outside of the structure"). Here, there is no evidence that Tarr makes any commercial use upon the tracts themselves, and he concedes that were he to establish a leasing office or similar indicia of business, his property use would then violate the Timberwood covenants.