# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00732-CV

**Michael Sides, Susan Sides, Bobby Sides, Gregory George, Staci George, Claudio Acosta, and Laura Acosta, Appellants**

**v.**

**Shon Saliga, Jani Saliga, and Garden Grove, LLC, Appellees**

## FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
## NO. 16-1225, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Michael Sides, Susan Sides, Bobby Sides, Gregory George, Staci George, Claudio Acosta, and Laura Acosta filed suit against appellees Shon Saliga, Jani Saliga, and Garden Grove, LLC.  Appellants and the Saligas are neighbors in the same subdivision, and appellants sought declaratory and injunctive relief barring the Saligas from operating Garden Grove, a wedding and special events venue, on their property.  Following a bench trial, the trial court signed a judgment in favor of the Saligas.  We will reverse the final judgment and remand for further proceedings.

### FACTUAL AND PROCEDURAL SUMMARY

In 2000, two large adjacent tracts of land were acquired by related entities: SGL Development, Ltd. acquired a 281-acre tract, and SGL Investments, Ltd. acquired a 577-acre tract.  SGL Development and SGL Investments are both managed by SGL Management, LLC.

In 2002, a Declaration of Covenants was filed, imposing restrictions on 196 acres out of the 281-acre tract owned by SGL Development. The Declaration of Covenants, however, recites that it was made by "SGL, Ltd." as Declarant, not SGL Development. At its conclusion, the Declaration recites:

DECLARANT:
SGL, LTD., a Texas limited partnership
By: SGL MANAGEMENT, LLC

The document is signed by J. Kelly Gray, as manager of SGL Management, and it was filed in Volume 1957, page 835 through 842, of the real property records of Hays County. The restrictions, among other things, provide that the property shall be used for single-family residential purposes and not for commercial uses; that trash would not be allowed to accumulate; and that firearms could not be discharged.

In 2005, the properties were sold to WFCRW, LLC, which subdivided the land and sold some of the subdivided lots to the parties herein. The relevant tracts are within the 196 acres described in the restrictive covenants. Jani Saliga bought her twelve-acre tract in March 2006, before her marriage to Shon Saliga. Because she was living in another state at the time, she closed on the property via a mail transaction, receiving a FedEx envelope of documents that were flagged for her signature, signing where indicated, and returning them via FedEx. Jani's deed, dated March 3, 2006, states, "This conveyance is made and accepted subject to the following matters, to the extent same are in effect at this time: (i) any and all restrictions, covenants, conditions and easements, if any, relating to the Property, but only to the extent they are still in effect, and shown of record in the hereinabove mentioned county and state." The closing documents included a survey of the property and a Commitment for Title Insurance

prepared by Chicago Title Insurance Company. The commitment stated that title insurance "insures you against loss resulting from certain risks to your title" and that certain risks will not be covered, specifically excluding from coverage "[t]he following restrictive covenants of record itemized below," including in that list the covenants, specifying that they were located at "Volume 1957, Page 835, Official Public Records, Hays County, Texas." The survey likewise notes that the land was subject to "restrictive covenants of record itemized below," including those located at "volume 1957, page 835."

In September 2014, the Saligas again obtained title insurance so that they could obtain financing to build their house. The new title commitment, issued by Westcor Land Title Insurance Company, did not exclude from coverage any restrictive covenants. The Saligas built their home in 2015, and in November 2015, Jani deeded the property to herself and her husband. In April 2016, the Saligas first hosted a wedding at their home, operating under the name "Garden Grove." In June 2016, appellants filed the underlying lawsuit, alleging that Garden Grove offered overnight lodging for up to thirty people and that "hundreds" of people and vehicles would attend events held at the venue. Appellants sought injunctive relief barring the Saligas from using their home as an event venue and declarations that the Saligas's property was subject to the covenants and that the operation of Garden Grove was in violation of those covenants.[1] The Saligas asserted that they were not bound by the covenants because Jani Saliga was a bona fide purchaser who had no notice of the covenants before buying the property and that appellants had waived the right to enforce the covenants by not enforcing them against other breaches in the area, including the operation of a substance-abuse-treatment facility that allows for overnight stays. They further asserted that the covenants could not be considered to

---

[1] Appellants also sued for nuisance, but they nonsuited that cause of action.

3

encumber any of the properties because the filings were in the name of "SGL, Ltd.," as opposed to "SGL Development, Ltd."

The trial court held a bench trial in which it heard testimony by Greg Way, Robert Burton, Michael and Susan Sides, Staci and Gregory George, the Saligas, Matthew Gorman, and Patrick Chase. Greg Way is a registered professional land surveyor who did survey work for the SGL entities on the two large tracts of land. Way was asked for his opinion about whether "SGL, Limited should be SGL Development, Limited," and he answered, "There's never been an SGL anything but development or investments associated with the property management—you know, the property work itself out there. We've never done work for an SGL, Limited." For Jani Saliga's original purchase of her twelve-acre tract in 2006, Way did the survey and the field notes that describe the property and note the restrictive covenants. His company also did the new survey for the Saligas about ten years later, when they were obtaining construction financing. The new survey tracked the new title commitment and did not note any restrictive covenants. Way said, "There's one title company that deleted those. Because we're—on a survey we show the title commitment information."

Robert Burton, a real estate attorney, testified that he was hired by SGL Development to prepare the restrictive covenants in question. He testified that the "declarant name is incorrect" and should read "SGL Development comma LTD period." He testified that the field notes attached to the covenants identify the tract that includes the Saligas's property. He also testified about his experience in reviewing title insurance commitments, explaining that "the best practice is to, number one, rely on the search of the title company. Number two, to—to determine what encumbrances actually affect the property that have been filed against the property in the official public records of the county in which the property is located." When

4

asked if by that he meant "you revert to the property description," Burton answered, "Yes." However, when Burton was later asked about how landowners are "indexed" with the county clerk, he said that "once you record the document it would be indexed under SGL comma LTD," not SGL Management or SGL Development. Asked if someone was "doing a grantor to grantee search using the names of the owners of the property as they appear in the chain of title, it would not pick up SGL, Limited," Burton said that he was "[n]ot sure" and that he had not "done a grantor search in a long time." However, he said, "Usually when we do one on—online it—it hits all of the similar names." He testified that he had executed an affidavit "indicat[ing] that I prepared the deed restrictions on behalf of SGL Development, Limited," to identify and correct the error. That affidavit was attached to a "Correction Instrument to: Declaration of Covenants [Rutherford Ranch]," which was filed by Staci George in the Hays County records in April 2017.

Michael Sides testified that before filing the lawsuit, he researched the real property records because the Saligas had asserted that "the restrictions weren't valid" because they had been "improperly filed." Michael said,

> So I went down to the county to check it out and I found—you know, it was pretty easy. It took me ten minutes and I found the restrictions. They have a map pretty much like that. You look it up, you go on the little computer and you can pull up the restrictions.

He explained further about the process, saying that the county's office has a map of the whole county, including all the subdivisions. He found their subdivision and looked it up on the county's computer, which pulled up the restrictive covenants.

Michael went on to testify about the events held at Garden Grove since the venue opened. He said the first event involved "probably several hundred cars," a live band that started "pretty loud" but got quieter, and then a DJ that "was extremely loud . . . because they had a

5

really bass beat." Michael testified that the music played by the DJ caused his windows to vibrate and shake and that the wedding went until past 10:00 p.m.

When he was asked about the substance-abuse-treatment facility, Michael said he was aware of the facility before the lawsuit was filed and that "my understanding of what it is is they have probably less than a dozen kids staying there that were maybe abused or—I don't know." He said that he was not aware of any complaints and that "they don't make any noise." Asked why he and others had not attempted to stop that use of property in the subdivision, Michael said, "They had eight or nine kids staying there, just like a family would, as opposed to we're talking about 500 people having parties every night. It's a little different." Michael also testified that although he had used his home address on his business filings for his construction business, he did not have clients or customers out to the house and did not conduct business at the house. Asked whether he ever had employees or subcontractors come to his house, he said, "No. I think maybe once or twice I might have had a sub come pick up a check or something." Michael said he might occasionally store "some stuff in my garage," although he said those materials might be for his personal use.

Michael's wife, Susan Sides, testified that she was a real estate agent. In addition to their having bought land in the subdivision, she also helped her father-in-law buy his tract in 2006. During that process, she obtained a marketing document for the subdivision from Dana Hunt, who "was marketing all of the different lots." That document, which listed the Saligas's tract, stated that the land was subject to "architectural restrictions, no mobile homes," and Susan investigated "if there were, in fact, architectural restrictions" and found "[t]hat there were." Susan testified about the first wedding held at Garden Grove and said that the guests parked close to their property, possibly over the property line; that the "live music went on for a while";

6

that the ceremony was held close enough to the Sides' house for them to hear the words; and that "the loudest part was later in the night when either a DJ or, like, some kind of recorded music came on." She said,

> It is our dream home. It's our neighbors' dream home. It's my 80-year-old-plus father-in-law's home. And they're trying, for their financial gain, to manipulate the system by a typo in my opinion. And it makes me feel hurt and sad and disappointed in people in general and—and—and upset.

Staci George testified that in about 2015, the Saligas told her that they were looking into hosting events at their house and that although they had complied with the covenants thus far, they had come to believe that the covenants were "not valid anymore or there's a defect in the restrictions." She also testified about the large number of cars and the music played at the wedding in April 2016. She said that at the time of that wedding, she and her husband had just started construction on their house. She said, "And it's unfortunate that we worked for 15 years to save and sacrifice, and now we're potentially going to be in our dream home next to a wedding venue with the goal of—one event—every weekend having an event." She also said that she and her husband had two small children "and it's not an ideal situation." Greg George testified that the title insurance policy he and Staci obtained when buying their property in 2013 noted the restrictive covenants and that a copy of the covenants was provided to them by "the seller's agent." The Georges provided videos taken at one of the Saligas's events at Garden Grove. Greg noted how many cars were parked, how close they were to the Georges' property, and how the entire ceremony was visible from his house. He further testified about the description of Garden Grove provided on the venue's webpage, which says the venue could accommodate "groups up to 500" and overnight "glamping"—"glamorous camping."

7

Shon Saliga testified that he did not see the document referred to by Susan Sides, which noted "architectural restrictions," until sometime in 2007, after Jani Saliga had purchased the tract, despite that document listing the Saligas's property among the tracts for sale. Shon testified that before they decided to build their house, he and Jani tried to sell the property and were told repeatedly that it "would be a perfect wedding venue." The Saligas "didn't believe we could do that" because Susan Sides had told them there were restrictive covenants on the property, but one agent responded that "she had sold property along that area—or had been involved with transactions on those tracts of land and that she didn't believe there were restrictions." The Saligas asked that agent to investigate further, and "[s]he reached out to our title company to confirm that the restrictions existed, came back and said—told us that we don't have restrictions." The Saligas were initially surprised but then, "We finally understood why the drug and rehab center was operating all of those years. We understood why the container business and everybody else was violating restrictions." He also testified that there was a deer feeder on Bobby Sides' property and that Bobby had called the Saligas in the past to tell them "that he's about to shoot a deer out there." Further, Shon testified, there were "trash piles" and construction material on Bobby's property, also in violation of the covenants.

Jani Saliga testified that she had no idea about the restrictive covenants when she bought the property in March 2006 and that it was important to her that the contract stated that there was no homeowner's association. She also testified that no one informed her that there were any restrictive covenants and that had she known, she "would not have bought this property" because she wanted "a piece of land that was free and clear." Jani testified that she did not "remember receiving a title commitment" in the closing documents she received in the mail. Although the closing documents referenced title insurance, Jani initially said, "I did not receive

8

that title policy." However, she then said that "evidently it was part of a title policy in my closing paper" but that she did not "look at it" or read it. She testified similarly about the survey—that she did not remember when she got it and that she did not read it.

Jani testified that she and Shon did not learn about the covenants until 2007, when they attempted to buy part of an adjoining lot. When they learned about the covenants, they "were extraordinarily bummed out" and decided to try to sell the tract. When that failed, they decided instead to build a house. As part of the loan process to get construction funds, they had another title commitment prepared, which showed that there were no restrictions on the property. Jani said that she and Shon called the escrow officer multiple times to doublecheck, and "she said, Yeah, there are no restrictions." Jani testified that she and Shon had noticed the signs for the treatment center and looked into it because "we were kind of curious because it was incongruent—incongruent with what" they had been told about the covenants. Jani testified:

> This is something I would like to just say very clearly. We operated on good faith. We think we—like Shon always says, we color inside the lines. We asked people. We checked. We double checked and triple checked. And then we went all in. He cashed retirement accounts. Like we're in—we're so into this that if we don't have the money from Garden Grove we cannot service our debt, we cannot pay our bills.

Shon testified similarly, saying that he and Jani had "cashed in everything we had" to build Garden Grove.

The Saligas testified that they had hired two off-duty sheriffs to be at the April 2016 wedding, and Shon explained that during the event, the officers monitored the sound level and verified that the music never violated any ordinances. Jani also testified that the reference to "glamping" should have been removed from Garden Grove's website.

9

Sheriff Patrick Chase worked security at the April 2016 event at Garden Grove. He testified that he received a complaint about the noise level, at which point he checked the decibel level and found it to be "averaging in the high 70s. However, it peaked at 83 one or— once or twice." Chase testified that, based on his experience, the event did not violate the Hays County ordinance that bans "disorderly conduct, noise" and includes an 85-decibel limit. Although the sound level did not exceed the ordinance's limit, he told the Saligas about the complaint, and they turned the music down.

Neighbor Matthew Gorman testified that he bought two tracts in the subdivision in 2011 and that he operates Nova, a for-profit substance-abuse-treatment program, on his property. His patients stay overnight, he can house up to sixteen patients at a time, and the treatment program is about seven or eight days long. He testified that he had a sign out in front of his facility "for several years" and that he advertised along a nearby farm-to-market road as well. He had never been told that he could not operate his facility, and he testified that "[t]here's no deed restrictions on that property."

At the conclusion of trial, the court signed a final judgment in favor of the Saligas, signing findings of fact and conclusions of law that we will set out below as relevant to our discussion. On appeal, appellants assert that the trial court erred in denying their request for injunctive and declaratory relief. They challenge the court's conclusions that the Saligas's operation of Garden Grove does not violate the applicable restrictive covenants, that Jani Saliga was a bona fide purchaser without notice of the covenants, and that appellants waived the right to enforce the covenants. Finally, they argue that they should have been awarded attorney's fees.

10

## STANDARD OF REVIEW

A buyer is bound by restrictive covenants only when she has actual or constructive notice of the limitations on her title. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 282 (Tex. 2018). We review the trial court's construction of a restrictive covenant de novo, using the same rules of construction applicable to contracts. *Id.* at 279-80; *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Bollier v. Austin Gurdwara Sahib, Inc.*, No. 03-09-00313-CV, 2010 WL 2698765, at *3 (Tex. App.—Austin July 9, 2010, pet. denied) (mem. op.); *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied). Thus, our primary concern is to give effect to the parties' intentions as expressed in the covenants. *Tarr*, 556 S.W.3d at 280; *Owens*, 241 S.W.3d at 129 (citing *Gulf Ins. Co. v. Burns Motors*, 22 S.W.3d 417, 424 (Tex. 2000)).

As for the trial court's denial of a request for injunctive relief, we review that decision for an abuse of discretion, meaning we ask whether the court acted in an unreasonable or arbitrary manner or misapplied the law to the facts. *Bollier*, 2010 WL 2698765, at *3 (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). In such a review, the factual and legal sufficiency of the evidence are not independent grounds for appeal but are relevant considerations.[2] *Id.*; *Goodson v. Castellanos*, 214 S.W.3d 741, 756 (Tex. App.—Austin 2007, pet. denied). If some evidence supports the trial court's order, the court did not abuse its discretion "to the extent it is

---

[2] In a legal-sufficiency review, we credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and ask whether the evidence would enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In a factual-sufficiency review, we consider all of the evidence and may set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

11

called upon to resolve fact questions in deciding whether to grant or deny injunctive relief."
*Bollier*, 2010 WL 2698765, at *3.

## WAS JANI A BONA FIDE PURCHASER WITHOUT NOTICE?

We first consider appellants' second issue, in which they argue that Jani was not a bona fide purchaser without notice of the covenants when she bought the property in 2006. As is relevant to this issue, the trial court made the following findings of fact:

8. Despite SGL Development, Ltd. being the owner of record of the 281 acre tract at the time the Declaration of Covenants was recorded, the Declarant identified in the Declaration of Covenants is "SGL, Ltd.", which was not the name of the owner of record of the 281 acre tract.

\* \* \*

18. In early 2006, prior to Jani Saliga's purchase of her 12.31 acre tract, her then boyfriend, Shon Saliga, visited the 12 acre tract one time for approximately thirty minutes. Shon Saliga walked the 12.31 acre tract and did not see anyone on the 12.31 acre tract or adjacent tracts during his visit. During his visit he was on the phone with Jani Saliga describing the 12.31 acre tract to her. At that time, the 12.31 acre tract and other properties in the area were rural and unimproved properties, and there was no signage indicating the 12.31 acre tract and surrounding properties might be encumbered with any restrictive covenants. Other than the aforementioned visit, Shon Saliga was not involved with Jani Saliga's purchase of her 12.31 acre tract.

\* \* \*

20. Jani Saliga purchased the 12.31 acre tract in good faith as part of an arm's length transaction with WFCRW, LLC.

21. Jani Saliga did not review any survey or a title insurance commitment prior to her purchasing the 12.31 acre tract.

22. Jani Saliga did not have any conversations with Greg Way prior to her purchasing the 12.31 acre tract.

23. Prior to her purchase of the 12.31 acre tract, Jani Saliga was not told the 12.31 acre tract might be encumbered with restrictive covenants as contained in the Declaration of Covenants or otherwise, and she had no actual knowledge of the

12

Declaration of Covenants.

24. Jani Saliga and Shon Saliga did not have any conversations or communications with Bobby Sides, Michael Sides, or Susan Sides until several months after Jani Saliga's March 3, 2006 purchase.[3]  Any actual notice of the Declaration of Covenants occurred after Jani Saliga's March 3, 2006 purchase of the 12.31 acre tract.

The court also made the following conclusions of law:

1. The failure to correctly identify the owner of record in the Declaration of Covenants resulted in the Declaration of Covenants being outside the chain of title to the 12.31 acre tract. Therefore, Jani Saliga was not charged with notice of the Declaration of Covenants at the time she purchased the 12.31 acre tract on March 3, 2006.

2. The Reservations from and Exceptions to the Conveyance language contained in the Warranty Deed whereby Jani Saliga acquired the 12.31 acre tract did not cause her to be charged with notice that the 12.31 acre tract was potentially encumbered with restrictive covenants or otherwise estop her from being able to assert the affirmative defense of bona fide purchaser.

3. Jani Saliga was not charged with notice of the contents of any title commitment or survey provided to her in connection with her purchase of the 12.31 acre tract on March 3, 2006.

4. The $186,000.00 paid by Jani Saliga for her purchase of the 12.31 acre tract constitutes valuable consideration.

5. Defendant Jani Saliga is a bona fide purchaser for value because she acquired the 12.31 acre tract on March 3, 2006 in good faith, for valuable consideration, and without actual or constructive notice of the Declaration of Covenants. Any knowledge of the Declaration of Covenants after March 3, 2006 does not defeat her status as a bona fide purchaser.

---

[3]  Michael Sides testified to the contrary, saying that he met Shon Saliga in 2006, when he was viewing the land before Jani Saliga's purchase.  At that time, Sides testified, Shon Saliga "asked about the restrictions," and Sides "pretty much described what I knew about them, about the—you know, just like on the—on that—I think the minimum size house was 2500 square feet, no commercial activities.  I don't remember what else."  However, Shon Saliga testified that no such conversation took place.  The trial court found that Sides and Saliga never had that alleged conversation, and we will not second guess the court's determinations related to witness credibility. *See Wilson*, 168 S.W.3d at 819.

6. Because Jani Saliga is a bona fide purchaser, she acquired the 12.31 acre tract free and clear of the Declaration of Covenants.

7. Because Jani Saliga is a bona fide purchaser, Shon Saliga acquired his interest in the 12.31 acre tract free and clear of the Declaration of Covenants on November 24, 2015 when Jani Saliga conveyed the 12.31 acre tract to herself and Shon Saliga.

8. Because Jani Saliga is a bona fide purchaser, Plaintiffs are not entitled to the declaratory and injunctive relief requested in this lawsuit, and take nothing on these claims.

A buyer's status as a bona fide purchaser is an affirmative defense, *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001), and a party asserting an affirmative defense has the burden of proving the defense, *Storck v. Tres Lagos Prop. Owners Ass'n, Inc.*, 442 S.W.3d 730, 743 (Tex. App.—Texarkana 2014, pet. denied); *Carter v. Cookie Coleman Cattle Co.*, 271 S.W.3d 856, 858 (Tex. App.—Amarillo 2008, no pet.). A buyer of real estate is charged with knowledge of the contents of deeds and other recorded instruments in her chain of title, *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 169 (Tex. 2013), and although "not all public records establish an irrebuttable presumption of notice, the recorded instruments in a grantee's chain of title generally do," *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007); *see* Tex. Prop. Code § 13.002 (instrument properly recorded in county records is "notice to all persons of the existence of the instrument"); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998) ("When the legal device of constructive notice is employed, a person is deemed to have actual knowledge of certain matters. Constructive notice creates an irrebuttable presumption of actual notice.").[4] "Chain of title refers to the documents which show the

---

[4] *See also Cooksey v. Sinder*, 682 S.W.2d 252, 253 (Tex. 1984) (per curiam) ("A purchaser is charged with knowledge of the provisions and contents of recorded instruments" and "with notice of the terms of deeds which form an essential link in their chain of ownership."); *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982) ("It

successive ownership history of the land. The chain of title is the successive conveyances, commencing with the patent from the government, each being a perfect conveyance of the title down to and including the conveyance to the present holder." *Munawar v. Cadle Co.*, 2 S.W.3d 12, 20 (Tex. App.—Corpus Christi 1999, pet. denied) (cleaned up).

We first consider the Saligas's contention that because the restrictive covenants recite that the declarant was "SGL, Ltd.," not "SGL Development, Ltd.," the actual owner of the land, the covenants are outside of Jani's chain of title. The Saligas assert:

> Given the law regarding a party's chain of title, the mistaken name of the Declarant in the Declaration of Covenants takes it outside Jani Saliga's chain of title because it would not be discovered when conducting a search using the names of the grantors and grantees as they appear in the property's chain of title.

They do not, however, cite to authority to support their argument that a relatively minor discrepancy in a document's recitation of a tract's owner's name operates to take that document entirely out of the property's chain of title. Instead, courts presented with similar misnomer issues have considered the evidence presented in the record to determine whether the error was sufficiently minor or the names sufficiently similar to have at least placed the buyer on notice that she should investigate whether there will be a competing claim against her title. *See, e.g.*, *Ballard v. Carmichael*, 17 S.W. 393, 395 (Tex. 1891) (deed should have been made to "Ranger Cattle Company of Throckmorton county" but instead was made to "Ranger Cattle Company of Shachelford county"; court held that evidence indicated that discrepancy was misnomer, "which does not affect the validity of the deed"); *Cobb v. Bryan*, 97 S.W. 513, 515-16 (Tex. App. 1906, no writ) ("Odd Fellows' Building & Exchange Company of Texas" owned property and was

---

is well settled that a purchaser is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims." (cleaned up)).

15

erroneously named in deed conveying land to plaintiff's predecessor as "Odd Fellows' Building & Saving Association"; court considered parol testimony related to misnomer and upheld validity of plaintiff's deed).[5]

The evidence establishes that SGL Development was the actual owner of the property and the filer of the restrictive covenants. Appellants presented testimony from attorney Robert Burton, who explained the error. They also arranged to have a corrected document filed in the real property records in April 2017 pursuant to section 5.028 of the property code, which provides for the correction of misnomers and describes them as "nonmaterial corrections." *See* Tex. Prop. Code § 5.028 ("Correction Instruments: Nonmaterial Corrections"; correction document may add, correct, or clarify "a party's name, including the spelling of a name, a first or middle name or initial, a suffix, an alternate name by which a party is known, or a description of an entity as a corporation, company, or other type of organization"). Jani's deed did not refer to the specific covenants but did say that the conveyance was made subject to any restrictions or covenants relating to the property, "to the extent they are still in effect, and shown of record in the hereinabove mentioned county and state." As noted above, the county's property records reflect that the covenants are in effect. Indeed, Michael Sides testified that he easily found the restrictions, which were listed in the subdivision's land records, by going to the county records

---

[5] *See also* Tex. Title Examination Standards, Standard 3.40, *reprinted in* Tex. Prop. Code, tit. 2, app. ("Recitals of Identity"; title examiner may rely on "recital of identity contained in a conveyance executed by the party whose identity is recited, unless the examiner has a reasonable basis for questioning the recital"). *Cf. Lemm v. Kramer*, 224 S.W. 560, 561-62 (Tex. App.— Beaumont 1920, no writ) (E.F. Perry conveyed land to I.R. McCasland, who conveyed land to D.F. Kramer; D.F. Kramer conveyed to Lemm, who sued to clear title from writ of attachment describing land as having been conveyed by *F.L.* Perry to *J.P.* McCasland; court stated that no evidence was introduced to explain whether "E.F. Perry" was known as "F.L. Perry" or whether "I.R. McCasland" was known as "J.P. McCasland," and thus chain of title as presented did not show that Lemm had constructive notice of writ of attachment).

16

office, finding the subdivision on the map, and looking it up on the computer. The Saligas did not attempt to rebut Michael's testimony or to present evidence showing that Jani would not also have discovered the covenants if she had done a search. *See Madison*, 39 S.W.3d at 606.

Jani was charged with knowledge of information contained in "any instrument" in her chain of title, *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982), and we hold that on this record, the omission of "Development" from the name of SGL, Ltd. as declarant did not put the covenants outside of Jani's chain of title so as to relieve her of being considered to have constructive notice of them. The trial court erred in concluding otherwise.

Further, as part of the closing process, Jani received the survey and a title insurance policy, both of which provided her with actual notice of the covenants. We disagree with the Saligas's contentions that Jani was not obligated to read the documents and that the information contained in them cannot be imputed to her, thus making her a bona fide purchaser without notice of the covenants. *See Ford*, 235 S.W.3d at 617; *Westland Oil*, 637 S.W.2d at 908.

Jani's undated real estate contract, which stated that closing would occur on March 3, 2006, provided that Jani would receive a survey of the property and a title insurance policy. The seller was to provide the survey within ten days of the contract's effective date and the title commitment was to issue within twenty days after the title company received the contract.[6] The contract also specified that Jani had a limited amount of time to object to any "defects, exceptions, or encumbrances to title" other than certain enumerated exclusions. Although Jani did not know when she actually received those documents, she admitted that she got them at some point during the purchase process, at the latest when she received her closing

---

[6] The survey is dated February 14, 2006, and the title commitment issued February 22, 2006, with an effective date of February 14.

17

documents.[7] Asked whether she read those or any other documents related to her closing, she said, "I didn't read anything."

Parties to a contract have an obligation to protect themselves by reading what they sign. *G-W-L, Inc. v. Robichaux*, 643 S.W.2d 392, 393 (Tex. 1982), *overruled on other grounds sub nom. by Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex. 1987); *Sosa v. Long Beach Mortg. Co.*, No. 03-06-00326-CV, 2007 WL 1711788, at *3 (Tex. App.—Austin June 12, 2007, no pet.) (mem. op.). Absent fraud, which the Saligas do not assert, a person who signs an agreement without knowledge of its contents is presumed to have consented to its terms and is charged with knowledge of the agreement's legal effect—the failure to read an instrument before signing it is not a ground for avoiding it. *Robichaux*, 643 S.W.2d at 393; *Sosa*, 2007 WL 1711788, at *3. In other words, "when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms." *National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424-25 (Tex. 2015) (party's decision to rely on oral representations instead of reading document "because he was 'in a hurry' and did not have his reading glasses with him" was not justifiable); *see also Burlington N. R.R. v. Akpan*, 943 S.W.2d 48, 51 (Tex. App.—Fort Worth 1996, no writ) ("we cannot find that a party's subsequent denial of knowledge of a material fact is any evidence of lack of knowledge where the party admits receipt of actual notice of the fact, then fails to read it or remember it, either by his own negligence or by his conscious choice").

---

[7] Although the trial court found that Jani did not review the title commitment or survey, it did not find that she did not receive them, as required by the contract, nor would the evidence support such a finding. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 796 (Tex. 2002) (implied factual findings must find support in evidence).

18

The Saligas insist that "any matters disclosed in a title commitment cannot be imputed to a buyer." However, as noted early, there is no need to impute knowledge when the matter is disclosed in the public records. *Tamburine v. Center Savings Association*, cited by the Saligas, does not assist our analysis because it concerns a claim of equitable title that arose from legal documents that were not recorded at the time of sale to the bona fide purchaser.[8] 583 S.W.2d 942, 947 (Tex. App.—Tyler 1979, writ ref'd n.r.e.). Nor do cases addressing the legal effect of information learned by a title company *but not disclosed* to a buyer have any bearing in this case, in which the information *actually was disclosed* by the title company. *See Hahn v. Love*, 394 S.W.3d 14, 35 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *Martinka v. Commonwealth Land Title Ins. Co.*, 836 S.W.2d 773, 777 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

Although information discovered but not disclosed by a title company will not be imputed to the insured,[9] *see Hahn*, 394 S.W.3d at 35; *Tamburine*, 583 S.W.2d at 949, it does not

---

[8] In *Tamburine v. Center Savings Association*, Center hired a company to provide title insurance and to act as escrow agent, and the court stated that even though the title company apparently acquired information related to the plaintiffs' equitable claim for title "while making its own investigation of title, such notice was acquired by it, not as Center's agent, but while the insurance company was engaged in activities which were indispensable to its determination of insurability." 583 S.W.2d 942, 948-49 (Tex. App.—Tyler 1979, writ ref'd n.r.e.). The court also held that an agent's knowledge cannot be imputed to his principal unless the agent's authority "extended to the very matter about which and concerning which such knowledge or notice was acquired"; that as escrow agent, the title company's authority was limited to the loan closing and did not extend to its title investigation; and that since it "acquired no knowledge of the plaintiffs' claim while acting in the scope of its duties as escrow agent, no question arises with regard to imputed notice." *Id*. We disagree that *Tamburine* is "directly on point."

[9] A title insurer's title search is conducted to protect the insurer's own interests because the only duty a title company owes its insured is to indemnify her against loss suffered by title defects. *See Hahn v. Love*, 394 S.W.3d 14, 35 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *Martinka v. Commonwealth Land Title Ins. Co.*, 836 S.W.2d 773, 777-78 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Tamburine*, 583 S.W.2d at 947. However, while it does

follow from the logic of those cases that information that *is* located, disclosed, and excluded from coverage by a title company in its self-protecting title search, as occurred in this case, should not be considered as putting the insured on notice of the disclosed issues. Such a conclusion would essentially render useless any exclusions made in a title policy and would be contrary to caselaw in which information in surveys or title commitments is considered when determining whether a buyer had notice of that information. *See, e.g.*, *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *4 (Tex. App.—Austin July 10, 2012, pet. denied) (mem. op.) (title commitment noted and excluded restrictive covenants from coverage, which provided O'Leary with notice of deed restrictions); *Sierra Assoc. Grp., Inc. v. Hardeman*, No. 03-08-00324-CV, 2009 WL 416465, at *6-8 (Tex. App.—Austin Feb. 20, 2009, no pet.) (mem. op.) (court noted that use restrictions were on file in public deed records and that survey reflected true ownership of adjoining land and stated that buyer could have learned of restrictions if it had exercised reasonable care and diligence); *Bartlett v. Schmidt*, 33 S.W.3d 35, 40 n.4 (Tex. App.—Corpus Christi 2000, pet. denied) (commitment's exclusion of restrictive covenant from coverage "provided Schmidt with adequate information to discover that his property was actually encumbered by the restriction").

Both the survey and the title commitment specifically note that the land is subject to the covenants, and Jani was responsible for reading the contents of her closing documents and

---

not owe a duty to examine title records or to disclose all possible encumbrances, the insurer can suffer consequences if it fails to do so—if an insurer does not discover or disclose information adverse to a buyer's title interests, it will be obliged to defend the buyer or to pay damages arising from unexcluded title defects. *See Martinka*, 836 S.W.2d at 776-77. For that reason, insurers generally perform title searches and disclose and exclude any potential issues. *See Tamburine*, 583 S.W.2d at 948-49.

thus was given notice of the covenants at the time she bought the property.[10] *See Robichaux*, 643 S.W.2d at 393; *Fox*, 2012 WL 2979053, at \*4; *Sosa*, 2007 WL 1711788, at \*3. The fact that she chose not to read her closing documents does not transform her into a bona fide purchaser without notice of the contents of the documents.[11] The trial court erred in concluding otherwise. We sustain appellants' second issue.

### DID THE SALIGAS VIOLATE THE COVENANTS?

We next turn to appellants' first issue, in which they argue that the Saligas's operation of Garden Grove is in violation of the restrictive covenants, an issue we review de novo under the same rules of construction applicable to contracts. *See Tarr*, 556 S.W.3d at 279-80. Appellants argue that the operation of the wedding venue violates paragraph 2.01 of the covenants, titled "General Restrictions," which includes the following provisions:

(a)     The Property shall be used solely for private single family residential purposes and/or recreational purposes. No multiple-family dwellings shall be permitted.

---

[10] Jani did not sign the survey or title policy, but the real estate contract referred to those documents, explained that they would inform Jani of restrictions or other possible title issues, and specified the time frame in which she could object to concerns raised by the documents. *See Jones v. Kelley*, 614 S.W. 95, 99-100 (Tex. 1981) (survey accurately describing land was provided week after signing of documents, and court stated, "When the instruments are construed together, the description of the entire property to be conveyed is sufficient to satisfy the statute of frauds."); *Gray & Co. Realtors v. Atlantic Hous. Found., Inc.*, 228 S.W.3d 431, 436 (Tex. App.—Dallas 2007, no pet.) (instruments pertaining to same transaction may be read together to ascertain parties' intent and may be construed together as if part of single, unified instrument; incorporated document must be referenced by name, and parties "are obligated to protect themselves by reading what they sign and are presumed, as a matter of law, to know the contract's terms" (cleaned up)).

[11] The omission of those restrictions from the Saligas's later title insurance policy, issued in 2014, does not change the fact that Jani was provided with notice of the restrictions in 2006, when she purchased the land.

21

(b) No more than one (1) single family residence shall be permitted upon any Tract. Each single family residence and any detached guest house on the Property shall be constructed of traditional materials. Each single family residence shall have a permanent foundation.

*** 

(d) No professional, business, or commercial activity to which the general public or any employee is invited shall be conducted on any Tract; provided that, in connection with the development and marketing of the Property, the Declarant shall have the right to maintain temporary sales and marketing centers and offices, and conduct marketing events to which the general public may be invited for so long as Declarant owns any portion of the Property.

(e) No Tract may be used as an apartment house, flat, lodging house, hotel, bed and breakfast lodge, or any similar purpose, but a single family residence located on a Tract may be leased for single family residential purposes.

The Saligas both testified that they live in the home and that it is their residence. They further testified that they had "only had four weddings in the last year." Appellants presented evidence that Garden Grove advertises that the property can be rented for between $4,000 and $8,950 for one-day events and for between $7,500 to $13,500 for overnight or full weekend use. Garden Grove's social media states that it can host events for "groups up to 500," and that it can provide seating for 200. Garden Grove advertises that it will accept bookings throughout the week and that it can provide amenities such as an "On site manager," a "complimentary brunch for the bridesmaids from our Cordon Bleu trained Chef" for twelve-hour or longer rentals, "Luxury cots for Family style sleeping" for up to thirty guests, a "Honeymoon suite," and "Glamping capabilities on The Green." It has hosted at least two events that were publicized on social media as vendor showcases at which people planning their weddings could meet vendors who provide wedding-related services. Appellants testified that numerous guests, and their respective vehicles, were present at Garden Grove's first wedding and that appellants

22

could hear and see the event from their residences. The Saligas testified that they hired off-duty law enforcement officers to help manage the first wedding.

After hearing the evidence, the trial court found that: Garden Grove "operates by appointment only and is not open to the general public"; Garden Grove does not have any employees; and "[t]he noise generated by the weddings does not exceed sixty five (65) decibels from the point of complaint located on Plaintiffs' properties." Based on those findings of fact, the court made the following conclusions of law:

> 9. The operation of Garden Grove, LLC does not violate Article 2.0l(a) of the Declaration of Covenants because the home is primarily used as a single family residence for Jani Saliga and Shon Saliga.
>
> 10. The operation of Garden Grove, LLC does not violate Article 2.0l(d) of the Declaration of Covenants because (1) Garden Grove, LLC is by appointment only and thus not open to the general public, and (2) Garden Grove, LLC does not have any employees.
>
> 11. The operation of Garden Grove, LLC does not violate Article 2.0l(e) of the Declaration of Covenants because renting the house out as a wedding venue does not constitute the use of the house as an apartment house, flat, lodging house, hotel, bed and breakfast lodge, or any similar purpose.
>
> 12. The operation of Garden Grove, LLC does not violate Article 2.03 of the Declaration of Covenants because the noise generated from the weddings complies with the applicable noise ordinance.

Covenants that restrict a person's free use of her land are not favored in Texas but will be enforced if they are clearly worded and confined to a lawful purpose. *Tarr*, 556 S.W.3d at 279, 282; *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987); *Jennings v. Bindseil*, 258 S.W.3d 190, 195 (Tex. App.—Austin 2008, no pet.). The language in a restrictive covenant will not be enlarged, extended, stretched, or changed by construction, and we will construe an ambiguous covenant strictly against the party seeking to enforce the restriction and resolve any

23

doubts in favor of the free and unrestricted use of the land. *Tarr*, 556 S.W.3d at 280; *Wilmoth*, 734 S.W.2d at 656; *Jennings*, 258 S.W.3d at 195.

The Saligas argue that we should not interpret paragraph 2.01(a) to prohibit all commercial activity because paragraph 2.01(c) "contains a specific provision allowing for commercial activity so long as the general public or any employees are not invited." They contend that if paragraph 2.01(a) "was truly intended to restrict all commercial activity and only allow for single family residential purposes, there would be no need to include" paragraph 2.01(c), and, therefore, that paragraph 2.01(a) should be read as only restricting "the type of residence that can be built on the property."

Paragraph 2.01(a) does in fact restrict the type of residence that can be built on the property, and more details about the kind of home that can be built are provided in paragraph 2.01(b). It does not, however, only speak to the type of residence. Paragraph 2.01(a) also specifies the "use" to which the property can be put: "The Property shall be used solely for private single family residential purposes and/or recreational purposes."[12] *See Tarr*, 556 S.W.3d at 287-88 (discussing when restriction limits kind of structure versus "use" restrictions); *Tien Tao Ass'n, Inc. v. Kingsbridge Park Cmty. Ass'n, Inc.*, 953 S.W.2d 525, 528 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (restrictive covenant may address both architectural form and allowable use by using language specifying that property shall be used "for residential purposes only" and that residence shall be single-family dwelling). The Saligas's interpretation would require us to disregard the language that states that the property "shall be *used* solely" for residential or recreational purposes. (Emphasis added.)

---

[12] We note that the trial court's determination that the Saligas were using their property "*primarily*" as a single-family residence does not comport with the language of the covenants, which provides that the property will be used "*solely*" for such purposes. (Emphasis added.)

Reading paragraph 2.01(a) as restricting the property from being used for commercial use does not, as the Saligas insist, render paragraph 2.01(d) meaningless. Paragraph 2.01(d) carves out an exception against the prohibition on most commercial use to allow WFCRW, as developer, to conduct commercial activity to sell the property, including constructing sales facilities and opening the property to the general public. And, by limiting the use of the property to residential and recreational use while specifically restricting commercial purposes to which employees or the general public are invited, the restrictions seem to acknowledge the reality that property owners who are using the property for their residence might need to make incidental use of their property to conduct private business, such as parking a company car, receiving packages related to work, or working from a home office.

Even if we were to read paragraph 2.01(a) as only placing a restriction on the kind of structures that can be built and read paragraph 2.01(d) in isolation from paragraph 2.01(a), the evidence shows that the Saligas's operation of Garden Grove violates the restrictions set out in paragraph 2.01(d)—the Saligas have hired off-duty deputies to provide security and they advertise an "on site manager" and a professional chef as amenities provided to those who rent the house. Furthermore, although rental of the property must be arranged in advance, there is no indication that the general public is not invited to rent the property—instead, the evidence shows that the Saligas advertise to the public at large for event rental, albeit one event at a time, and there was evidence that Garden Grove has advertised vendor showcases on social media, asking only that attendees RSVP, thus inviting the general public to those events in an attempt to build more business. Finally, the operation of Garden Grove also violates paragraph 2.01(e) because the Saligas advertise that the property may be rented overnight or for an entire weekend; that

guests may "glamp," sleep on "luxury cots," or stay in the honeymoon suite; and that overnight guests will be given a brunch for thirty people.[13]

Contrary to the trial court's findings of fact, the evidence establishes that Garden Grove is a commercial business, that the Saligas invite employees to the property for commercial purposes, and that the property can be rented for overnight stays similar to use as a bed and breakfast. Further, the trial court erred in its conclusions that the Saligas's operation of Garden Grove does not violate the restrictive covenants. We sustain appellants' first issue on appeal.

### DID APPELLANTS WAIVE THE RIGHT TO ENFORCE THE COVENANTS?

In appellants' third issue, they challenge the trial court's determination that the restrictive covenants had been abandoned or waived.

The Saligas successfully argued below that the covenants had been waived based on other violations they claim to have gone unpunished in the same neighborhood, specifically violations of paragraph 2.01's restrictions on commercial activity discussed above; paragraph 2.02, which is entitled "Rubbish and Debris: Storage of Materials" and provides that "[n]o rubbish or debris of any kind shall be placed or permitted to accumulate upon the Property . . . so as to render the Property or any portion thereof unsanitary, unsightly, offensive, or detrimental to any other property or to its occupants"; and paragraphs 2.03 and 2.04, which provide that "[n]o noise or other nuisance shall be permitted to exist or operate upon any portion of the Property so as to be offensive or detrimental to any other portion of the Property or to its occupants" and that

---

[13] The Saligas assert that such overnight use is merely "incidental," but it is hard to see a reasonable distinction that would allow the Saligas to rent Garden Grove overnight or through a weekend, providing brunch for thirty guests in the process, while disallowing the use of the property as a bed and breakfast, and we will not strain the language used in the covenant barring the property from being used as a hotel, a bed and breakfast, or "any similar purpose." *See Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 280 (Tex. 2018).

26

"[h]unting on the Property is prohibited. The use or discharge of firearms or other weapons is strictly prohibited." The trial court made the following relevant findings of fact:

37. Bobby Sides has hunted deer and shot firearms on his property.

38. Bobby Sides has piles of trash and building materials on his property.

39. Michael Sides operates his construction business from his home located on the 13.80 acre tract of land.

40. A for profit substance abuse treatment center allowing for temporary and extended overnight stays has been allowed to operate on property allegedly encumbered by the Declaration of Covenants since 2011.

It then concluded that:

The actions of the parties have resulted in an abandonment of the Declaration of Covenants as a whole, and the allowance of the operation of other businesses on the properties allegedly encumbered by the Declaration of Covenants constitutes a waiver of [Article] 2.01(a), (d), and (e) as it relates to the parties.

The covenants, however, also contain a "nonwaiver" clause, which states that "[t]he failure to enforce any provision of the [covenants] at any time shall not constitute a waiver of the right thereafter to enforce any such provision or any other provision of the [covenants]," and such clauses are generally enforceable. *See TX Far W., Ltd. v. Texas Invs. Mgmt., Inc.*, 127 S.W.3d 295, 306 (Tex. App.—Austin 2004, no pet.); *Musgrove v. Westridge St. Partners I, LLC*, No. 02-07-00281-CV, 2009 WL 976010, at *4 (Tex. App.—Fort Worth Apr. 9, 2009, pet. denied) (mem. op.). A nonwaiver clause will be held to be ineffective only if the party seeking to avoid the covenants can demonstrate "a complete abandonment of the entire set of restrictions, including the nonwaiver provision." *Vance v. Popkowski*, 534 S.W.3d 474, 479-80 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Musgrove*, 2009 WL 976010 at *4. "Complete

abandonment is demonstrated when there is evidence of violations so pervasive that they have destroyed the fundamental character of the neighborhood." *Vance*, 534 S.W.3d at 480.

The evidence shows that appellants, who are Garden Grove's neighbors, use their properties for their families' private residences. Indeed, the Saligas themselves use the property as a residence when it is not being rented as an event venue. Michael Sides uses his property as his business mailing address, but he testified that he does not conduct business from the property other than perhaps having a subcontractor to the house to pick up a check on rare occasion or storing materials, some of which are for his personal use, in his garage. There is no evidence that the treatment facility has disrupted the neighborhood or that Bobby Sides's occasional hunting or storage of trash or building materials has harmed the character of the neighborhood. Setting aside the fact that the restrictive covenants require that each covenant be deemed independent from the others, even if all the asserted violations are considered, together they do not rise to the level of destroying the character of the neighborhood.[14] *See id.* The nonwaiver clause is therefore valid, meaning that any earlier failures to enforce the covenants did not waive appellants' right to enforce them against the operation of Garden Grove. *See id.*

Even absent the nonwaiver clause, we would hold that the trial court erred in concluding that the covenants had been waived. A residential restrictive covenant will not be waived if the complained-of non-conforming use is substantially different in its effect on the neighborhood from any prior violation. *Sharpstown Civic Ass'n, Inc. v. Pickett*, 679 S.W.2d 956, 957 (Tex. 1984); *Bollier*, 2010 WL 2698765, at *6. The party seeking to show waiver of restrictive covenants must prove that the earlier violations were so extensive and material as to

---

[14] Paragraph 3.06 provides, "The provisions of this Declaration shall be deemed independent and severable, and the invalidity or partial invalidity of any provision or portion hereof shall not affect the validity or enforceability of any other provision."

lead to a conclusion that the covenants had been abandoned. *Bollier*, 2010 WL 2698765, at \*6; *Cox v. Melson-Fulsom*, 956 S.W.2d 791, 794 (Tex. App.—Austin 1997, no pet.). An earlier, unobjected-to violation, "if insignificant or insubstantial when compared to the proposed or new use, will not support a waiver of the new and greater violation." *Pickett*, 679 S.W.2d at 958. And, "[i]t is well established in Texas that a property owner is not precluded from enforcing a deed restriction which materially affects her merely because she previously failed to complain of a violation which did not materially affect her in the enjoyment of her property." *Cox*, 956 S.W.2d at 794 (citing *Stewart v. Welsh*, 178 S.W.2d 506, 508 (Tex. 1944)).

As described earlier, the evidence establishes that the earlier violations had a substantially smaller impact on the neighborhood, in comparison to Garden Grove inviting hundreds of commercial guests to the Saligas's property and the attendant noise, traffic, and parking concerns. Michael Sides testified that although he and his wife did not want to incur the costs that would be associated with seeking the closure of the quiet and nondisruptive treatment facility, the operation of Garden Grove had had a negative effect on the Sides' enjoyment of their property significant enough that they decided to take action. There is no evidence to support the trial court's conclusion that the restrictive covenants had been abandoned or waived. We sustain appellants' third issue on appeal.

**ATTORNEY'S FEES**

In their fourth issue, appellants assert that they were entitled to attorney's fees incurred in enforcing the restrictive covenants.

On appeal, appellants seek fees under the property code, which provides, "In an action based on breach of a restrictive covenant pertaining to real property, the court shall allow

29

to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." Tex. Prop. Code § 5.006(a). The Saligas argue that appellants have waived the right to seek attorney's fees under section 5.006 because in the trial court, they only sought fees under the Uniform Declaratory Judgments Act.[15] However, this court has held under similar circumstances that if a party is entitled to a mandatory award of attorney's fees, how the party asks for them is "irrelevant." *Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 702 (Tex. App.—Austin 2013, no pet.). Our sister courts have held similarly. *See RDG P'ship v. Long*, 350 S.W.3d 262, 277 (Tex. App.—San Antonio 2011, no pet.) ("Even if a party pleads an incorrect or inapplicable theory or statute in support of an attorney's fee award, the award is not precluded."); *Mitchell v. LaFlamme*, 60 S.W.3d 123, 130 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("if a party pleads facts which, if true, entitle him to the relief sought, he need not specifically plead the applicable statute in order to recover under it").

Appellants, who included a general prayer for attorney's fees in their trial court petition, have prevailed on appeal. Under these facts, appellants are entitled to mandatory attorney's fees under section 5.006. *See* Tex. Prop. Code § 5.006 (court "shall" award reasonable attorney's fees to prevailing party in covenant enforcement case); *Bollier*, 2010 WL 2698765, at *9 (attorney's fees under section 5.006 are mandatory); *Mitchell*, 60 S.W.3d at 130-31 (because property owners sought attorney's fees under UDJA and provision similar to section 5.006 and included general prayer for fees, court held that owners had not waived applicability of section 5.006). We sustain appellants' fourth issue and remand the cause for an award of reasonable attorney's fees and costs. *See Bollier*, 2010 WL 2698765, at *9.

---

[15] "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code § 37.009.

## CONCLUSION

We have sustained all of appellants' issues on appeal. We conclude, therefore, that the trial court abused its discretion in denying appellants' request for injunctive relief. We further conclude that the court erred in denying appellants' request for attorney's fees. *See id.* at *3, 9. We remand the cause to the trial court for further proceedings in accordance with this opinion.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Kelly

Reversed and Remanded

Filed:   June 20, 2019

31