# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-21-00244-CV

**Appellant, Richard Witt Duncan// Cross-Appellants, Prewett Rentals Series 2 752 Military, LLC, Tami Jan, Ward Galbreath, Sumit Kapoor, Rachel Kapoor, Nakul Jeirath, Tasha Jeirath, Mark L. Reis, Janis R. Reis, Charles A. Bess, Jr., Dancee D. Bess, Christopher Bellshaw, Catherine Bellshaw, Santos S. Salinas, and Debra Salinas**

v.

**Appellees, Prewett Rentals Series 2 752 Military, LLC, Tami Jan, Ward Galbreath, Sumit Kapoor, Rachel Kapoor, Nakul Jeirath, Tasha Jeirath, Mark L. Reis, Janis R. Reis, Charles A. Bess, Jr., Dancee D. Bess, Christopher Bellshaw, Catherine Bellshaw, Santos S. Salinas, and Debra Salinas// Cross-Appellee, Richard Witt Duncan**

### FROM THE 433RD DISTRICT COURT OF COMAL COUNTY
### NO. C2018-15744D, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

This permissive appeal involves the interpretation of restrictive covenants governing the Canyon Lake Island subdivision in Comal County ("the Subdivision"). The parties are property owners in the Subdivision. Appellant Richard Witt Duncan filed suit against the cross-appellants named above (collectively, "Defendants"), seeking to enjoin them from engaging in activities that Duncan alleged violated the restrictive covenants. Defendants counterclaimed, seeking declarations that the activities in which they were engaged did not violate the restrictions. The parties filed competing motions for summary judgment, which the district court denied. We will affirm the district court's order.

BACKGROUND

According to the allegations in Duncan's petition, the Subdivision, platted in 1970, "is one of the older residential subdivisions on Canyon Lake in Comal County." In 1999, the Subdivision property owners voted to amend the restrictive covenants governing the Subdivision. Section III of the restrictions, labeled "Property Use," provides in relevant part that:

1. No building or lot shall ever be used or occupied for any purpose *except that of a private residence, . . .* An owner or other resident of the residential unit may conduct business activities within a residential unit so long as:

   a.) the existence or operation of the business activity is not detectable by sight, sound or smell from outside the residential unit . . . .

(Emphasis added.) The restrictions provide the following definition of "business":

The term "business" shall be construed to have ordinary, generally accepted meanings, and shall include, without limitation, any occupation, work or activity undertaken on an ongoing basis which involves the provision of goods and/or services to persons other than the provider's family and for which the provider receives a fee, compensation or other form of consideration, regardless of whether: (a) such activity is engaged in full or part time; (b) such activity is intended or does generate a profit; or (c) a license is required from such activity.

Duncan alleged that Defendants violated the above restrictions by using their properties other than as private residences, operating detectable businesses on their properties, and using their properties to operate detectable businesses. More specifically, Duncan contended that:

Defendants are engaged in vacation rental operations, including renting their properties to members of the public for use and occupancy other than as a private residence, in violation of Section III of the Restrictions.

Defendants' vacation rental operations involve the provision of goods and/or services to persons other than their families for a fee, compensation, or other form of consideration, in violation of Section III of the Restrictions.

Defendants' vacation rental businesses are detectable, in that they collectively book as many as 67 (or more) vacationers most summer weekends, while Defendants themselves are absent. Subdivision residents have readily detected these groups, by sight, sound, and smell. Defendants have made no effort whatsoever to limit the detectability of their business operations at their properties in the Subdivision. To the contrary, Defendants have repeatedly broadcasted to every possible resident in the neighborhood that they conduct vacation rental operations on their properties, and they will continue to do so until restrained by a court.

Defendants' vacation rental operations are ongoing and are clearly a "business" within the Restrictions' definition of "business."

Duncan thus sought to permanently enjoin Defendants from: (1) participating in, allowing, or permitting transient use or occupancy that is not as a private residence on any of their respective properties in the Subdivision; (2) participating in, allowing, or permitting to exist any detectable business on properties in the Subdivision including paid, transient occupancy; and (3) violating any of the other covenants, conditions, and restrictions of the Subdivision.

In response to Duncan's petition, Defendants filed a counterclaim seeking declarations as to their leasing rights under the restrictions. In their pleading, Defendants acknowledged that they "have been renting out their homes in the subdivision for short terms for at least 14 years," that "[a]ll the defendants in this case advertise their homes for rent on the internet," that they "rent their homes for terms less than 30 days while reserving the right to rent for any other duration, more or less than 30 days," that "[s]ome of the defendants use property

3

management entities to handle the rentals of their homes," and that "[a]ll the defendants applied for and remit the Texas Hotel Tax, which is applicable to all rentals of less than 30 days in the state of Texas." Defendants further claimed that "[a]ll the defendants lease their main dwelling homes solely to natural persons for use as dwelling homes," that "[t]hey lease the entirety of the homes at a time, and not individual rooms," that "[t]he properties contain no business offices, leasing offices, signage, or any business activity upon the lots," that "[n]o concierge or room services are provided," and that "[t]raffic and occupancy are consistent with the requirements of law and ordinances."

Defendants argued that the restrictions expressly contemplated the leasing of their properties to renters. Specifically, Section II provides that "[a]ll covenants and restrictions shall be binding on the owners, his successors, heirs and assigns *and on any persons renting or leasing from the owners*, and are to inure to the benefit of the entire Subdivision." (Emphasis added.) Additionally, Section III allows for the placement of one sign outside each property for the express purpose of "advertising the property for sale or *rent*." (Emphasis added.) However, the restrictions contain no provisions regarding the duration of any such rental or leasing activity. Thus, Defendants sought declarations that "the deed restrictions at issue do not bar Defendants' leasing according to minimum duration" and that "if Defendants' leasing for any given duration is a 'business' under the 1999 Restrictions, then their leasing for any given duration is still allowed under the 1999 Restrictions because it satisfies the requirements for an allowed business use."

Defendants subsequently sought (1) traditional summary judgment on their counterclaim and against Duncan on his claim for breach of the restrictive covenants, and (2) no-evidence summary judgment on Duncan's claim for breach of the restrictive covenants.

4

Duncan also filed a traditional motion for summary judgment on his claim that Defendants had violated the restrictive covenants. Summary-judgment evidence admitted by the district court included a copy of the restrictive covenants; Duncan's deposition testimony and discovery admissions; Defendants' unsworn declarations and responses to discovery requests; and sworn declarations by Duncan and other witnesses to activities by renters that occurred in the Subdivision. The district court denied Defendants' traditional and no-evidence motions for summary judgment and, in a separate order, denied Duncan's traditional motion for summary judgment.[1]

In its order denying Duncan's traditional motion for summary judgment, the district court explained its reasoning for denying both Duncan's motion and Defendants' traditional and no-evidence motions. The district court first concluded that the relevant restrictions were unambiguous: "[P]ermissible uses and occupations are limited to that of a private residence as well as allowable business activities within a residential unit." Regarding Duncan's motion, the district court concluded that: (1) Duncan was "not able to establish, as a matter of law, that an owner's rental, in and of itself, of restricted property is inconsistent with the 'Property Use' provisions of the covenants"; (2) "the summary judgment evidence fails to sufficiently establish that the tenants in question use or occupy the buildings or lots for a purpose other than family-styled residential living-type activities, nor does any evidence demonstrate, as

---

[1] Duncan filed an additional motion for summary judgment, seeking to dismiss Defendants' counterclaim for declaratory judgment on the grounds that the Uniform Declaratory Judgment Act is not available to settle disputes already pending before a court and that a party may not merely restate a defense in the form of a declaratory judgment in the hopes of recovering attorney's fees. *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669, 671 (Tex. 2009); *BHP Petrol. Co. v. Millard*, 800 S.W.2d 838, 841–42 (Tex. 1990). However, there is no indication in the record that the district court has ruled on this motion, and we will not address it in this appeal.

a matter of law, a usage of the properties that was open to the public"; and (3) the summary-judgment record "does not include evidence that would establish as a matter of law that either owners or tenants conducted any other business activity (regularly providing goods or services to non-family for compensation) 'within the residential unit' of which its existence is detectable from outside the residential unit." The district court added, "Beyond that, what may or may not be later adequately proven to be a proscribed and detectable business activity need not be determined at this juncture" because "[r]esolution of such questions are inherently fact driven and thus inappropriate for summary judgment."

Regarding its denial of Defendants' motions for summary judgment, the district court explained that "use of the term 'private' does have meaning, albeit the common meaning as applied here, i.e., not public," and that it was possible for an occupant of the property to use their residence in a manner that was not "private":

> Whether one is an owner, co-owner or other resident, including a tenant, of a subject building or lot, it is possible that either type of possessor or occupant of such restricted property could violate the undefined yet unambiguous covenant if it were made available to public use with, in *absurdum*, some open-ended, no holds-barred, come-and-go-as-you please, party-at-the-palace advertisement. . . . If shown that either an owner or a tenant allowed unfettered access by anyone to "trample through the house or swim in its pool," a factfinder might determine such public access violated the covenants regarding use or occupancy of a restricted building or lot to that of a "private residence."

The district court found that Duncan had presented at least some evidence that such a violation had occurred:

> Within the affidavits submitted by Duncan, witnesses relate numerous alleged eyewitness accounts of drastically increased frequency of motor vehicle traffic on the roads and foot traffic in and out of residences, increased traffic pulling fishing

6

boats to and from rentals and Canyon Lake, increased and overflowing amounts [of] trash when occupants appear not to be homeowners, etc. The relative increases in these areas at least raises an eyebrow causing one to rationally find or believe that business and commerce might likely be involved as visitors come and go from rented properties. Plaintiff's summary judgment proof, when viewed in the light most favorable to him as non-movant therein, established more than a scintilla of evidence that the complained-of uses or occupancies could be something other than "private." Accordingly, [Defendants'] use of the subject properties may, factually, have been inconsistent with the common meaning of that term as used within the covenants, and summary judgment for Defendants would be improper.

The parties filed cross-petitions for permissive appeal, and the district court later amended its order denying summary judgment to grant permission for a permissive interlocutory appeal to address: (1) whether the Subdivision's 1999 deed restrictions are ambiguous regarding whether the Defendants' vacation-rental operations are prohibited; (2) if the 1999 deed restrictions are not ambiguous, whether the Defendants' "alleged violation of these deed restrictions," specifically their vacation-rental operations, "is a matter of law for the trial court to decide"; and (3) whether the 1999 deed restrictions preclude the Defendants' vacation-rental operations as a matter of law. This Court then granted Duncan's petition for permissive appeal and granted in part[2] Defendants' petition for permissive appeal to address these and any "fairly included" subsidiary issues. *See* Tex. Civ. Prac. & Rem. Code § 51.014(d), (f); Tex. R. App. P. 28.3; *see also Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 146–47 (Tex. 2022) (explaining that "permissive appeals are resolved according to the same principles as any other appeal, including addressing all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue").

---

[2] We denied the Defendants' petition for permissive appeal of the district court's "implied denial of Defendants' motion for sanctions." *See Duncan v. Prewett Rentals Series 2 752 Military*, No. 03-21-00244-CV, 2021 WL 3118420, at *2 (Tex. App.—Austin July 22, 2021, order) (per curiam).

## STANDARD OF REVIEW

A trial court's ruling on a motion for summary judgment is reviewed de novo. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018) (citing *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004)). "To prevail on a motion for traditional summary judgment, the movant must show that no material fact issues exist and that it is entitled to judgment as a matter of law." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022) (citing Tex. R. Civ. P. 166a(c)). "To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim." *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing Tex. R. Civ. P. 166a(i)). "When competing summary-judgment motions are filed, 'each party bears the burden of establishing that it is entitled to judgment as a matter of law.'" *Tarr*, 556 S.W.3d at 278 (quoting *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)). In conducting our review of the motions, "we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

## DISCUSSION

### Whether the deed restrictions are ambiguous

We first address whether the restrictions are ambiguous. "Whether a restrictive covenant is ambiguous is a question of law for the court to decide by looking at 'the covenants as a whole in light of the circumstances present when the parties entered the agreement.'" *Tarr*, 556 S.W.3d at 280 (quoting *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998)). "[R]estrictive covenants are subject to the general rules of contract construction." *Id.* "Like a

8

contract, covenants are 'unambiguous as a matter of law if [they] can be given a definite or certain legal meaning.'" *Id*. (quoting *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)). "On the other hand, if the covenants are susceptible to more than one reasonable interpretation, they are ambiguous." *Id*. However, "'[m]ere disagreement over the interpretation of a restrictive covenant does not render it ambiguous.'" *Id*. (quoting *Buckner v. Lakes of Somerset Homeowners Ass'n*, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied)). "A paramount concern when construing covenants is giving effect to the objective intent of the drafters of the restrictive covenant as it is reflected in the language chosen." *Id*. (citing *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987); *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied)). "Accordingly, '[c]ourts must examine the covenants as a whole in light of the circumstances present when the parties entered the agreement,' giving the 'words used in the restrictive covenant . . . the meaning which they commonly held as of the date the covenant was written, and not as of some subsequent date.'" *Id*. (quoting *Pilarcik*, 966 S.W.2d at 478; *Wilmoth*, 734 S.W.2d at 658).

The restrictions at issue here provide that "[n]o building or lot shall ever be used or occupied for any purpose except that of a private residence." Because the restrictions do not define "private residence," we must give those words their common meaning. *See id*. "Private" means "belonging to or for the use of one particular person or group of people only," *Private*, New Oxford American Dictionary (2001), and "secluded from the sight, presence, or intrusion of others," *Private*, American Heritage College Dictionary (3rd ed. 2000). "Residence" means "a person's house," *Residence*, New Oxford American Dictionary (2001), and "the place in which one lives; a dwelling," *Residence*, American Heritage College Dictionary (3rd ed. 2000). Thus, a "private residence" is a house or other dwelling place where one lives that belongs to one person

9

or a group of people and that is secluded from the sight, presence, or intrusion of other people who do not live there.

The restrictions further provide that "[a]n owner or other resident of the residential unit may conduct business activities within a residential unit so long as the existence or operation of the business activity is not detectable by sight, sound or smell from outside the residential unit." The restriction defines "business" broadly, using its "ordinary, generally accepted meanings," including "without limitation, any occupation, work or activity undertaken on an ongoing basis which involves the provision of goods and/or services to persons other than the provider's family and for which the provider receives a fee, compensation or other form of consideration," without regard to whether "(a) such activity is engaged in full or part time; (b) such activity is intended or does generate a profit; or (c) a license is required from such activity." This restriction is unambiguous in that it clearly prohibits any business activity that is detectable from outside the residence. Thus, the restrictions have a definite legal meaning and are not ambiguous: the property can be used only as a secluded dwelling place for a person or group of people, and any business activity conducted within that dwelling place is limited to that which is "not detectable by sight, sound or smell from outside the residential unit."

**Whether the Defendants' vacation-rental operations violate the deed restrictions as a matter of law and whether the deed restrictions preclude the Defendants' vacation-rental operations as a matter of law**

The other two issues involved in this permissive appeal are interrelated. Because the restrictions provide unambiguously that the properties can be used only as "private residences" and that any "business activity" conducted on the properties cannot be detectable by sight, sound, or smell from outside the residential unit, the remaining questions are whether

10

Defendants' vacation-rental operations are allowed or prohibited by those restrictions as a matter of law and whether Duncan provided some evidence that the rentals in this case violated the restrictions so as to survive Defendants' no-evidence motion for summary judgment.

"[C]ovenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are clearly worded, they will be enforced." *Wilmoth*, 734 S.W.2d at 657 (citing *Davis v. Huey*, 620 S.W.2d 561 (Tex. 1981)). "All doubts must be resolved in favor of the free and unrestricted use of the premises, and the restrictive clause must be construed strictly against the party seeking to enforce it." *Id*. "A covenant under review 'may not be enlarged, extended, stretched or changed by construction.'" *JBrice Holdings, L.L.C. v. Wilcrest Walk Townhomes Ass'n, Inc.*, 644 S.W.3d 179, 183 (Tex. 2022) (quoting *Tarr*, 556 S.W.3d at 280). "Thus, to validly limit an owner's property use, a covenant must plainly prohibit that use." *Id*. "No construction, no matter how liberal, can construe a property restriction into existence when the covenant is silent as to that limitation." *Tarr*, 556 S.W.3d at 285.

The Texas Supreme Court elaborated upon these principles in *Tarr v. Timberwood Park Owners Association, Inc.*, a case involving restrictive covenants similar to the restrictions at issue here. In *Tarr*, the covenants included the restriction that "[a]ll tracts shall be used solely for residential purposes, except tracts designated on the above-mentioned plat for business purposes, provided, however, no business shall be conducted on any of these tracts which is noxious or harmful by reason of odor, dust, smoke, gas fumes, noise or vibration." 556 S.W.3d at 285–86. The homeowners' association in *Tarr*, which sought to enjoin short-term rentals, argued that "residential" implied living on the property for a prolonged time period, which would exclude "transient" and "temporary" leasing of the property. *Id*. at 288. Additionally, the covenants limited the type of building that could be built on the property to

"single-family residences." *Id*. at 286. The association argued that renting the property to parties who were not members of a single family violated that restriction. *Id*. at 285.

The court rejected these contentions. The court first observed that "[t]he single-family residence restriction merely limits the structure that can properly be erected upon Tarr's tract and not the activities that can permissibly take place in that structure." *Id*. at 287. The court then examined the "residential purposes" restriction and concluded that it applied to "the activity that actually takes place on the land" as opposed to the "owner's use of the property." *Id*. at 289. Thus, the homeowner could use the property to generate rental income, so long as the income was generated from activity on the property that was limited to "residential purposes." *See id*. The court then defined "residential purposes" to mean "living purposes" as opposed to "business purposes" and declined to construe any additional restrictions beyond the express prohibition against the use of the property for anything other than residential purposes:

> The covenants in the Timberwood deeds fail to address leasing, use as a vacation home, short-term rentals, minimum-occupancy durations, or the like. They do not require owner occupancy or occupancy by a tenant who uses the home as his domicile. Instead, the covenants merely require that the activities on the property comport with a "residential purpose" and not a "business purpose." We decline to add restrictions to the Timberwood covenants by adopting an overly narrow reading of "residential."

> . . . .

> Affording these phrases their general meanings and interpreting the restrictions as a whole, we hold that so long as the occupants to whom Tarr rents his single-family residence use the home for a "residential purpose," no matter how short-lived, neither their on-property use nor Tarr's off-property use violates the restrictive covenants in the Timberwood deeds. Moreover, Tarr's use does not qualify as a commercial use. Accordingly, as the association failed to adduce any evidence that Tarr's tenants have used the property in any manner inconsistent with a residential purpose, summary judgment for the association was improper.

12

*Id.* at 290–91. However, the court added, "[W]e confine this interpretation to the unambiguous language of these particular restrictive covenants. We recognize that another court may reach a different conclusion if the covenant it reviews defines 'residential' or 'business' uses by specifically enumerating prohibited conduct." *Id.* at 291.

The restrictions in this case, similar to the restrictions in *Tarr*, do not prohibit and in fact contemplate renting the properties to others. This is demonstrated by the language in Section II of the covenants providing that the restrictions "shall be binding on . . . any persons renting or leasing from the owners," and the language in Section III allowing for the placement of one sign outside each property for the express purpose of "advertising the property for sale or rent." However, the restrictions are silent as to "vacation rentals" specifically, and therefore, following the reasoning in *Tarr*, we cannot conclude that such rentals are prohibited as a matter of law. At the same time, we cannot conclude that they are permitted as a matter of law. The restrictions prohibit any use of the property other than as a "private residence" and any "business activity" on the property that is "detectable by sight, sound or smell from outside the residential unit." Vacation rentals may or may not violate those restrictions, depending on the facts and circumstances surrounding the rentals.

According to the affidavits submitted by Defendants, the following facts and circumstances are characteristic of their rentals:

> Defendants rent out the entirety of their properties to tenants for the tenants' exclusive use for the full lease term, usually less than 30 days. Tenants have exclusive possession of the property during the term of the lease, and the homeowners "do not surveil them or violate their privacy or right of possession."

> The homes are rented fully furnished, but the owners do not sell the furnishings to the tenants.

13

The tenants engage in the "ordinary incidents of residential occupancy," such as eating, sleeping, parking, entering and exiting, lounging outside, and generally using and enjoying the homes and the grounds that they have rented.

None of the defendants operate businesses from their Canyon Lake Island homes, have business offices in their homes, or otherwise engage in business activities or transactions at their homes or upon their properties in the subdivision. None of the defendants engage in the sale of goods or services at their homes or upon the properties. All transactions surrounding the leasing out of the properties is done via the internet, on the telephone, or otherwise not upon the properties. There are no employees at the homes. There is no cash register or business information or payment processing system at any of the homes.

The tenants do not run businesses at the homes, have business offices at the homes, or otherwise engage in business activities or transactions at the homes or upon the properties.

All the defendant homeowners accept compensation, in the form of rent, from their tenants in exchange for the tenants' right to occupy, use, and enjoy the homes during their periods of occupancy.

Some of the defendant homeowners use internet websites and portals to list or market their homes for rent, and to "book" rentals; others use third-party property managers.

The defendants and their rental documents refer to their tenants as "guests," and to lease inception as "check in" and lease expiration as "check-out."

The defendants hire third parties to clean, maintain, and repair their homes.

Tenants can be complete strangers to the defendant homeowners apart from the landlord-tenant relationship.

Some tenants are on vacation when they occupy the defendants' homes. However, the defendants do not question tenants on the purpose of their stay.

Some tenants use cars to drive to and park at the defendants' homes.

14

All the defendants pay mandatory local and state "hotel" occupancy taxes for tenant stays of less than 30 days. The defendants also pay federal income taxes. However, the defendants do not pay hotel or federal taxes from their Canyon Lake homes; they do that online and from other places.

Defendants characterize the above activities as "the ordinary incidents of leasing," which would not be prohibited by the restrictive covenants. Duncan, on the other hand, characterizes Defendants' activities as running "tourist lodging businesses" that are more akin to hotels than to rental properties. In Duncan's view, Defendants' "guests" are licensees rather than tenants, with only "the limited privacy associated with licensing a hotel room," and Defendants and their guests are engaged in detectable business activities on the properties, which would be prohibited by the restrictive covenants.

In April of this year, the Texas Supreme Court decided *JBrice Holdings, L.L.C. v. Wilcrest Walk Townhomes Association, Inc.*, 644 S.W.3d at 184–86, and rejected arguments similar to those made by Duncan here. In that case, the covenants included the following restriction:

> No Owner shall occupy or use his Building Plot or building thereon, or permit the same or any part thereof to be occupied or used for any purpose other than as a private single family residence for the Owner, his family, guests and tenants . . . . No Building Plot shall be used or occupied for any business, commercial, trade or professional purposes either apart from or in connection with the use thereof as a residence.

*Id*. at 184. The homeowners' association, which opposed short-term rentals, attempted to distinguish its case from *Tarr* by arguing that the above restriction "regulates the use of the property, unlike the restriction in *Tarr*, which merely regulated activity occurring on the property." According to the association, the homeowner "generate[d] rental income from its

15

leases," which made its use of the property "commercial rather than residential." *Id*. The association further argued that "a short-term tenant's use is not residential; rather, courts should classify such tenants as licensees, like hotel guests, instead of true lessees." *Id*. The association also argued that the restriction "requires an occupant's use to be both residential and 'private,'" and short-term rentals were not "private." *Id*. In the association's view, a short-term rental was "more like a hotel license because a short-term renter is a transient occupant." *Id*. at 186 n.30.

The court rejected these arguments, concluding that the restriction in that case was similar to the restriction in *Tarr*:

> Like the restriction in *Tarr*, the Wilcrest Walk residential-use covenant describes the permitted use of a townhome and imposes no minimum on the duration of a lease agreement. The reading of "residential" the Association advances—that the term implies a lease of a particular duration—is identical to the reading we rejected in *Tarr*. We reject it here as well.

*Id*. at 185. Moreover, as in *Tarr*, the covenants did not "preclude rental income generated by residential occupancy." *Id*. The covenants equated tenant use with owner, family, and guest use, thereby excepting tenant use from the prohibition against commercial activity. *Id*. The court explained, "When the income derived from a use is in the form of rent, and the nature of that use is residential occupancy, then this residential-use provision does not prohibit it." *Id*. The homeowner's "leasing business does not occupy the premises; its tenants do. Because tenants are included among those permitted to use the townhomes, with no expressed restriction as to the minimum duration of such use, a short-term tenant does not violate the residential-use covenant." *Id*.

The court also rejected the association's attempt to equate "private" use with "non-commercial" use. The court defined "private" to mean "for the use of one particular person

16

or group of people only" and observed that in the Wilcrest Walk covenants, "such a group expressly includes 'tenants,' which deprives 'private' of the meaning the Association assigns the term." *Id*. The court added, "Even if 'private' ordinarily could evoke non-commercial use, the commercial use provision excepts tenant occupancy, and it requires no minimum duration for the exception to apply." *Id*. at 186.

Finally, the court rejected the association's attempt to equate short-term occupancy to hotel use. The court noted that "a short-term rental—even one subject to hotel occupancy taxes—is not a hotel use if the owner conducts no business onsite" and explained that "a short-term rental is a lease so long as it maintains the characteristics of a lease; namely, the right to use and occupy the property." *Id*. at 186 & n.30. In that case, the homeowner "contracts with tenants to allow them the right to exclusively occupy the townhomes for the duration specified in the rental agreements," and "[t]he Association introduced no agreement to demonstrate that [the homeowner] granted a license rather than a tenancy to occupants of its townhomes." *Id*. at 186.

In this case, as in *JBrice*, the covenants do not distinguish between owners and tenants. Accordingly, tenant use of the property, and any income generated from that use, is generally allowed under the restrictive covenants, provided that the rentals "maintain the characteristics of a lease, namely, the right to use and occupy the property," and further provided that, consistent with the specific restrictions in this case, the tenants are using the properties for no purpose "except that of a private residence" and engaging in no business activities detectable by sight, sound or smell from outside the residential unit.

17

However, although vacation rentals are generally allowed, Duncan provided at least some evidence that the vacation rentals in this case violate the restrictive covenants. First, the rental agreements of at least three of the Defendants contain the following provision:

> LIMITED SHORT-TERM RENTAL. It is expressly understood and agreed that this is a short-term vacation rental and *is not a lease* or other long-term residential tenancy agreement. *This Agreement is only for the licensed use of the Vacation Rental* for the stated reservation dates. *It creates no property rights in you* and no rights to renewal or for recurring usage. You shall not sublet the Vacation Rental or any part of it and shall not assign any interest (in whole or in part) to this Agreement or any rights hereunder.

(Emphases added.) Additionally, some of the rentals are booked through Airbnb, and that service informs guests that their "booking of an Accommodation . . . is a *limited license* granted to [them] by the Host" (i.e., the Defendants) and that if they "stay past the agreed upon checkout time," they "no longer have a *license* to stay in the Accommodation." Further, the rental agreement of Tami Jan and Ward Galbreath provides that the homeowner "reserves the right to enter the home anytime to investigate disturbances, check occupancy, check for damage, and make repairs or improvements as Owner deems necessary or appropriate," which is inconsistent with a tenant's right to occupy the property exclusively for the duration of the rental agreement. *See* Tex. Prop. Code § 92.001(6) (defining tenant as "a person who is authorized by a lease to occupy a dwelling to the exclusion of others"); *Levesque v. Wilkens*, 57 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("A lease grants a tenant exclusive possession of the premises as against the owner."). These provisions are some evidence that the rentals do not "maintain the characteristics of a lease" as required by *JBrice* but are instead mere licensing agreements.

18

On the other hand, we cannot conclude that these agreements establish as a matter of law that Defendants have violated the restrictive covenants. Again, "a short-term rental is a lease so long as it maintains the characteristics of a lease; namely, the right to use and occupy the property." *JBrice Holdings, L.L.C.*, 644 S.W.3d at 186 & n.30. Defendants presented some evidence that their vacation rentals "maintain the characteristics of a lease." According to the affidavits submitted by Defendants, they "rent out the entirety of their properties to tenants for the tenants' exclusive use for the full lease term," "[t]enants have exclusive possession of the property during the term of the lease," and the Defendants "do not surveil them or violate their privacy or right of possession." The tenants' use and occupancy of the property includes "eating, sleeping, parking, entering and exiting, lounging outside, and generally using and enjoying the homes and the grounds that they have rented," which is consistent with the characteristics of a lease. Thus, while the agreements provide some evidence that the vacation rentals are licenses, there is other evidence that the vacation rentals are leases, thus precluding summary judgment for either Duncan or Defendants.

Finally, we agree with the district court that "use of the term 'private' does have meaning," and that meaning here includes "secluded from the sight, presence, or intrusion of others." *Private*, American Heritage College Dictionary, *supra*. Thus, if Defendants or their guests used the properties in a manner that was not private, then they violated the restrictive covenants. As the district court observed, "If shown that either an owner or a tenant allowed unfettered access by anyone to 'trample through the house or swim in its pool,' a factfinder might determine such public access violated the covenants regarding use or occupancy of a restricted building or lot to that of a 'private residence.'" There is some evidence that such non-private use occurred here. Specifically, Duncan averred that he had "seen as many as 9 cars

19

parked overnight at the Reis property, and several times 8, 7, or 6 cars there overnight." Other homeowners made similar statements. Duncan's wife, Rose, averred that she had "seen driveways so full of vehicles that multiple vehicles had to park out on the road," including "as many as 8 to 10 vehicles in the driveway next door." She had also seen "countless strangers staying at the Reis property on weekdays and weekends," "overflowing trash cans on the curb," and "loud parties congregating . . . around the firepit and pool" in one of the vacation-rental yards. Homeowner Larry Horton averred that he had "observed groups of cars (five or more) parked in front of some of the vacation rental properties, as well as observed trash not in garbage containers along the streets at some vacation rental properties, usually beside an over-filled garbage container." Homeowner Dan Carroll averred that he had "observed as many as six or seven vehicles squeezed into the open space in front of a known rental house" and was "aware of an incident where a short-term renter was sunbathing nude in the backyard and was visible from the adjoining property." Homeowner and board member Richard Conley averred that property owners had complained to him "about the vacation rental properties being used as party houses" and vacation rental guests "shooting fireworks, trespassing to get to the lake, flying a drone, damaging a neighbor's privacy fence, visibly swimming nude, speeding and reckless driving, cars parked along the street, and loud cursing." We conclude that this evidence, when viewed in the light most favorable to Duncan as the non-movant, raises a genuine issue of material fact as to whether Defendants and their guests used the properties in a manner that was inconsistent with their restricted use as "private" residences.

**CONCLUSION**

We affirm the district court's denial of Duncan's traditional motion for summary judgment and the Defendants' motions for traditional and no-evidence summary judgment.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:  August 19, 2022